**INTERGRAPH CORPORATION,**
Plaintiff,

v.

**INTEL CORPORATION, Defendant.**

No. CV–97–N–3023–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

April 10, 1998.

N. Lee Cooper, James L. Priester, Luther Dorr, Jr., Maynard Cooper & Gale, William J. Baxley, Joel E. Dillard, Baxley Dillard Dauphin & McKnight, Birmingham, AL, David V. Lucas, Intergraph Corp., Huntsville, AL, William L. Jaeger, William J. Bohler, K.T. Cherian, George Marcus Schwab, Stephen James Akerley, Townsend Townsend & Crew LLP, San Francisco, CA, Byron W. Cooper, Townsend and Townsend and Crew LLP, Palo Alto, CA, for Plaintiffs.

Thad G. Long, Bradley Arant Rose & White, Birmingham, AL, Gary C. Huckaby, Kimberly Bessiere Martin, Bradley Arant Rose & White, Huntsville, AL, Joel M. Freed, Marc Gary Schildkraut, Howrey & Simon, Washington, DC, for Defendants.

### Memorandum of Opinion and Preliminary Injunction

EDWIN L. NELSON, District Judge.

## I. Background.

The court has for consideration the motion and the renewed motion of plaintiff Intergraph Corporation for a preliminary injunction. The motions essentially seek to prevent defendant Intel Corporation from refusing to engage in future business with the plaintiff in the same or similar manner that it has done from approximately 1993 until the present dispute arose between the parties in 1997. The amended complaint is in twenty-three counts and includes, *inter alia*, claims under state law theories of fraud, fraudulent suppression, negligent failure to warn, negligence, wantonness and willfulness, breach of contract, intentional interference with business relationships, breach of express warranty, breach of implied warranty of fitness for a particular purpose, and violation of the Alabama Trade Secrets Act. The complaint contains three claims for patent infringement and a single count charging anti-trust violations under 15 U.S.C. §§ 1 and 2. Jurisdiction in this court is founded upon 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity of citizenship), 28 U.S.C. § 1338(a) and (b) (patent infringement and unfair competition), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

On Monday, December 8, 1997, the court held a hearing (the "Hearing") on Intergraph's verified motion to enjoin Intel from cutting off or delaying its supply of computer chips and product information (the "Verified Motion"), which was filed in open court on November 21, 1997 (Document # 16).[1]

At the Hearing, Intergraph presented the live testimony of Wade Patterson, currently the President of Intergraph's Computer Hardware Division (Tr. 51), who testified that he holds a B.S. degree in Electrical Engineering (Tr. 207) and that he has previously worked as Intergraph's Vice–President of Engineering and its Executive Manager for Systems Development (Tr. 101–02).[2] Intergraph also submitted and served in open court during the Hearing Mr. Patterson's supplemental affidavit on which Intel was allowed to cross-examine him. (Intergraph Ex. I; Tr. 236–41). In support of its motion for a preliminary injunction, Intergraph also filed the affidavits of Allen Blaxton, Bryan Floyd, Mike Ellard, James Meadlock, Terry Phillips, and Wade Patterson. (Document # 29).

Prior to the Hearing, on December 3, 1997, Intel filed and served on Intergraph the affidavits of Keith Johnson and Ron Epstein (Documents 26 and 27). At the Hearing, Intel presented no live testimony from its own employees, but it called as its own witness, James Meadlock, Chairman and CEO

---

1. In this opinion, the court will often identify the particular document that is the subject of discussion by referring to the clerk's document number. For example, the plaintiff's motion is Document # 16 in the clerk's official file.

2. References to the Hearing transcript are made parenthetically with "Tr." and the relevant page number(s). References to affidavits and declarations under 28 U.S.C. § 1746 are made parenthetically using the affiant's last name and the relevant paragraph or exhibit number. For convenience, both affidavits and declarations will be referred to as affidavits. Hearing exhibits are referenced by party name and exhibit number or letter.

of Intergraph, who was voluntarily present in the courtroom. (Tr. 241). Intel also submitted the affidavit of Anand Chandrasekher during the Hearing. (Tr. 122; Intel Ex. 2).

Then on December 10, 1997, with permission of the court, Intel supplemented its hearing presentation with the affidavit of Edwin Bauernfreund under seal. Intergraph responded with the affidavits of Sanford C. Morris, Jr., Kirk Totten, and Allen Blaxton and the Second Supplemental Affidavit of Wade Patterson on December 12, 1997. Also, the parties have each submitted proposed findings of fact and conclusions of law for the court's consideration, and those submissions have been helpful.

Generally, under Fed.R.Civ.P. 65, in order to prevail on its motion for a preliminary injunction, Intergraph must prove: (1) it has a substantial likelihood of ultimate success on the merits of one or more of its substantive claims; (2) there is a substantial threat that it will suffer irreparable injury in the absence of preliminary relief; (3) the likely injury to itself is greater than that likely to be suffered by the defendant; and (4) entry of the

preliminary injunction would not disserve the public interest. *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627 (11th Cir. 1992), *reh'g denied,* 961 F.2d 224 (1992). Where, as here, the plaintiff advances antitrust claims, preliminary relief is specifically authorized by 15 U.S.C. § 26.[3]

Upon due consideration, the plaintiff's motion for a preliminary injunction will be granted.

## II. Findings of Facts.

Based upon the affidavits filed by the parties, the testimony at the Hearing and the exhibits received at the Hearing, the court makes the following findings of fact.[4]

### A. Intel's Position in the Microprocessor Market.

Defendant Intel Corporation is the world's largest designer, manufacturer, and supplier of high-performance microprocessors,[5] frequently described as the "brains" of a computer because they control the central processing of data in personal computers.[6] (Intergraph Ex. F). Intel also de-

---

3. Title 15, section 26 provides:

 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff. 15 U.S.C. § 26.

4. It should be clearly understood that the "facts" found here are for purposes of ruling on the motions for a preliminary injunction only. They are based upon the evidence received to this

point and may prove illusory after a full trial on the merits of the parties' contentions.

5. In the technical community comprising the personal computer industry, these microprocessors are also called "central processing units," or "CPUs." The court may from time to time in this opinion refer to them using any of those three terms.

6. Of primary interest in the present context is the "workstation" which comprises the largest part of Intergraph's business. A "workstation" is defined as

 [A] machine designed to run as fast as possible, that includes not only the CPU, such as a Pentium II, but all the different subsystems that go within the machine. That means that the machines cost a little bit more, in some cases a lot more, but the customers that we sell those to are willing to pay more because performance is everything to them.

 Workstations are powerful computers designed to run demanding scientific, engineering, design and graphic intensive applications. They are generally used in the design of complex facilities such as nuclear power plants and bridges. They are also used in the entertainment and motion picture industry for creating special effects and animation for movies and for television commercials.

signs, manufactures, and supplies: (1) "chipsets" which, in conjunction with the CPUs, perform essential logic functions surrounding the CPU in computers based on Intel architecture processors;[7] (*Id.*); (2) motherboards which combine Intel microprocessors and "chipsets" to form the basic subsystem of a PC or server;[8] (*Id.*); and (3) graphics subsystems to provide graphic functions for computers and workstations. (Patterson Supp. Aff. ¶¶ 7–9).

Most of the entire world's personal computers today are powered by Intel designed and manufactured microprocessors of the "x86" variety, originally created by Intel.[9] *See* Competitive Impact Statement and Complaint in *United States v. Microsoft*, 59 Federal Reporter 42845, August 14, 1994. In 1996, Intel received eighty-eight percent of the total revenue derived from microprocessors sold for use in desktop computers, laptops,[10] servers, and workstations, or $14.6 billion out of a total of $16.6 billion. Within the "x86" market, Intel had a market share of eighty-five percent. (Patterson Supp. Aff. ¶ 7). *See* December 22, 1997, *Business Week* article.

In its fiscal year 1996, Intel had total revenues of $20.8 billion and net income be-

(Tr. 54–55).

7. By affidavit, Mr. Patterson testified:

Intel's 386 and 486 computer chips became popular in the early eighties, through their inclusion in the IBM personal computer ("PC"). The Intel x86 chips were the brain of the IBM PC, but were only designed to handle low end tasks. Intel's x86 chips were not capable of handling high-end workstation needs. However, the IBM PC was an "open architecture" system which permitted others to design their own IBM "compatible" PCs. As a result, "open architecture" and "compatibility" became of utmost importance to personal computer users. "Open architecture" compatibility also became of utmost importance to workstation users.
(First Patterson Aff. ¶ 5).

8. A "PC" is generally described as a less powerful computer than a "workstation" and is generally used by individuals for business, academic, and pleasure uses. Many PCs, also called "desktops," are quite powerful and many, particularly those used in businesses and academia, are interconnected through "networks" that are hosted by one or more "servers."

fore taxes of $7.9 billion—a profit percentage of approximately thirty-eight percent. It has consistently made very high profits. (1996 Intel Annual Report)[11]

Intel, over a period of almost twenty years, has continued to develop the "x86" line of microprocessors, creating ever faster and more powerful units. Its current generation of the "x86" microprocessors, the Pentium series, is an extraordinarily complex product, which is difficult and expensive to design and manufacture. According to Intel, the Pentium Pro processor has 5.5 million transistors and can execute 300 million instructions per second. More than 200 major steps are required to produce the Pentium Pro. (1996 Intel Annual Report).[12]

Intel's dominance in the market for personal computer CPUs is reflected in its name recognition among the computer buying public, the great majority of whom insist upon having a genuine Intel CPU in their computers.[13] The "Intel Inside" brand promotion has helped to create a remarkable demand for the Intel product. More than 1,300 licensees worldwide participate in the "Intel Inside" program with each computer bearing a distinctive Intel logo. In 1996, the journal *Financial World* designated the Intel brand

9. The "x86" line of computer chips apparently derives its name from the Intel 8086 and 8088 chips, which powered the first IBM line of personal computers, beginning in the early 1980s.

10. A "laptop" is a small battery powered portable computer that, at least in theory, will fit on one's "lap."

11. "With a ninety percent market share in PC microprocessors, Intel's sales have headed skyward, growing fifty to eighty percent annually for the past four years." That made it "the eighth-most-profitable company in the world in 1996...." *Business Week*, December 22, 1997, p. 70.

12. In its issue of December 22, 1997, *Business Week* reported that Intel was spending $4.5 billion in 1997 on new chip making plants.

13. Other manufacturers of personal computer CPUs based upon the "open" architecture previously used by Intel are Cyrix, AMD, and IBM. (Tr. 106). As noted, combined they, and perhaps other manufacturers, share less than fifteen percent of the market.

as the tenth most valuable brand in the world. (1996 Intel Annual Report).

The Intel microprocessors are compatible with a number of computer operating systems, but they are used primarily with operating systems created and supplied by Microsoft Corporation.[14] In other litigation, the United States Department of Justice has contended for a number of years that Microsoft itself has a monopoly on operating systems for personal computers. *See United States v. Microsoft, supra.* Intergraph uses Microsoft's Windows NT, a thirty-two bit operating system powerful enough to run both business and technical applications for all Intergraph workstations and other products. (Tr. 75–76).

Until the development of its latest generation of Pentium II microprocessors, Intel used an "open architecture," which was available generally to all participants in the industry. For example, other manufacturers such as Cyrix, AMD, and IBM designed, developed and marketed microprocessors that were more or less compatible with the earlier Intel CPUs. Beginning with the Pentium II, however, Intel changed to a closed or proprietary architecture, which included the use of a new "bus," the P6. This means that the Pentium II and planned Intel microprocessors, the Deschutes and the Merced, are not and will not be compatible with other CPUs. (Tr. 64–65). Moreover, the latest Intel CPUs are technologically superior, at least in terms of their ability to interact with and handle the advanced graphics functions required by high-end workstations,[15] to all other so-called Intel compatible microprocessors. (Tr. 70–71).[16]

Computers manufactured by Original Equipment Manufacturers ("OEMs") to use Intel microprocessors must be specifically designed and manufactured to meet the precise physical and technical requirements of the Intel architecture. For example, Intel chips, before the Pentium II, were mounted on flat sockets, the P7 Bus, that physically accepted similar chips from other manufacturers. (Plaintiff's Exhs. C and D). The Pentium II is mounted on its edge in the P6 Bus, which, as of the date of the Hearing, accepts microprocessors from no other manufacturer. (Plaintiff's Exhs. A and B). These

---

14. These operating systems are Microsoft DOS, Microsoft Windows, Windows 95, and Windows NT. Just as other microprocessors may be used with the Microsoft computer operating systems, those operating systems are capable of being used with microprocessors other than those made by Intel. It would be a mistake, however, to assume that microprocessors and computer operating systems are freely interchangeable. They are not. Instead, operating systems, microprocessors, and computer subsystems, such as Intergraph's graphics subsystems, must be carefully matched to assure reliable optimum performance. For example, several years ago IBM and Motorola engaged in a joint effort to create and produce an alternative to Intel's high performance microprocessors. The IBM/Motorola microprocessor, the PowerPC, was originally supported by Microsoft with its Windows NT operating system. As noted at the Hearing by Mr. Patterson, however, Microsoft has now withdrawn its support for the PowerPC microprocessor, making it unavailable to manufacturers, such as Intergraph, who are committed to the Windows NT operating system. (Tr. 165–166).

15. Intel submitted the affidavit of Keith Johnson, its Huntsville, Alabama, representative, in which he states that some other manufacturers produced microprocessors that are "advertised to be comparable to" Intel's Chips. (Johnson Aff. ¶ 14).

16. There are, in fact, microprocessors on the market that are faster than any current version of the Pentium II. The Alpha microprocessor from Digital Equipment Company was the fastest CPU available as of the time of the Hearing, and there are others that are faster than the Intel products. None of these, however, are compatible with, and therefore usable, in the Pentium based workstations designed and manufactured by Intergraph. (Tr. 103–104). Not all of these CPUs are capable of running on the Windows NT operating system. See, for example, the PowerPC. Also, it is not mere operating speed that distinguishes the Pentium II. The Pentium II microprocessor also has the capability to handle the advanced graphics requirements of high-end workstations. In cross-examining Mr. Patterson, counsel for Intel implied that the Alpha CPU would be a potential alternative to Intel's products. While *not a part of the evidence,* counsel for Intergraph stated (Tr. 25), and the court is aware of reports in the media, that as a part of the settlement of litigation between Intel and Digital Equipment Company, Intel will acquire ownership and control of the Alpha chip. Thus, even if it were economically and technologically feasible for Intergraph to switch its products to the Alpha chip, it could *still be forced into a* customer/seller relationship with Intel.

physical differences may be only the most obvious ones, vis-a-vis other Intel CPUs. Intel has purposely changed its CPU architecture by using proprietary sockets and otherwise, converting from the previously "open architecture" to a new "closed architecture." [17] (Tr. 85). This "closed architecture," for practical purposes, allows Intel, by exercising its intellectual property rights in its "closed architecture," to wield absolute power over who will and who will not be allowed to participate in that part of the high-end computer industry that is based upon the "x86" microprocessor. Inasmuch as it requires two or more years and millions of dollars to design and develop a mother board and graphics subsystem to accept and take advantage of a CPU such as the Pentium II or any possible alternative, (Tr. 69) [18] OEMs, such as Intergraph, who rely entirely on Intel for their supply of microprocessors and chip sets have become technologically and financially locked in to the Intel CPU, its associated chip sets, and the P6 Bus, and they have no feasible alternative to it. (Patterson Supp. Aff. ¶ 14). The evidence makes clear that Intel has 100 percent of the market for the high-end CPUs that are used in "x86" based computer workstations, approximately 60 percent of the total workstation market. (Tr. 262).

In addition to requiring an adequate supply of the fastest and most powerful Intel microprocessors, OEMs, such as Intergraph, are capable of competing in the marketplace only if they also have access to: (1) Intel's advance confidential technical information, which is necessary to develop new products and to service existing products; (2) advance samples of Intel's development chips, which are needed by Intergraph to develop its own next-generation products using those chips (hereinafter referred to as "Chips Samples"); and (3) early releases of Intel chips, related products, and related technical information, which is necessary for Intergraph to test and produce its products (hereinafter referred to as "Early Release Chips").

The evidence suggests, and the court finds for present purposes, that, because of Intel's dominant position in the microprocessor market, no other computer industry participant can realistically be expected to expend the enormous sums required to develop and produce a product that could compete with the Pentium II and its anticipated successors. (Tr. 160–61). Moreover, it would not be possible for any potential Intel competitor to create a competitive product sufficiently soon to provide a viable alternative to which Intergraph could switch in the immediate future.

17. Mr. Patterson testified that the new P6 Bus is not compatible with products available from others in the computer industry and that no one else in the industry is working on an alternative product that would be compatible with the P6 Bus. (Tr. 66, 70–71). Intel's lawyer suggested that Intel had licensed the rights to the P6 Bus to others, including IBM, implying that such licensees could soon produce a product that would be competitive with the Pentium II. (Tr. 109–10). Intel, however, introduced no evidence to support this suggestion. In any event, Mr. Patterson confirmed (on re-direct) that the mere license of rights to the P6 Bus does not solve the problem of lack of alternative products that confronts Intergraph (or others similarly situated). (Tr. 217–18). The court finds that Intel manufactures the only microprocessor with the necessary speed and graphics handling capabilities that also will "fit" the P6 Bus, the Bus that has been designed into and used on Intergraph's most recent mother boards. Furthermore, there was no evidence that IBM or any other chip maker could produce a P6 compatible CPU within a reasonable time or even that any chip maker might be inclined to invest the billions of dollars that would be required to duplicate the performance of Intel's latest products.

18. Defendant, though admitting that there is no other CPU presently available that could give the plaintiff the performance it requires to be competitive in the high-end workstation market, suggested at the Hearing that Intergraph could easily substitute a different microprocessor for the Intel Pentium II. That contention is simply fantasy. The record refutes any such notion. In response to the court's question regarding a substitute CPU, Intel's counsel stated, "If you are asking me does there exist a chip out there today that they could pull out the Intel chip and plug it in, I think the answer to that is no." (Tr. 164). The simple fact is there is presently no practical substitute for the Pentium II, and if there were, it would be two years or more before Intergraph could design and produce the mother board and graphics subsystems necessary to use any such substitute. Even then, in the words of Intel's counsel, "They [Intergraph] may be downgraded from first class to coach, but they haven't been told they can't get on the plane." (Tr. 232).

In sum, the court finds if Intergraph is to compete in the high-end work station market for the foreseeable future, it has no alternative but to do so using Intel's latest and most powerful microprocessors and associated chip sets, and in order to use those microprocessors, it must have the cooperation of Intel, whether given willingly or by compulsion.

In the words of Mr. Patterson, Intergraph is both "technologically and economically 'locked in'" to its relationship with Intel. (First Patterson Aff. ¶ 19). Unless it is able to secure a continued supply of Intel chips, advance chip samples, essential advance technical information, support and advice, Intergraph cannot continue to design, manufacture and sell competitive workstations. (*Id.*) Moreover, if Intergraph is not allowed to participate on a competitive basis in that market, it will suffer enormous losses of revenue, adversely impacting on the employment opportunities of its 8,500 employees. Finally, Intergraph's reputation for technical excellence and its business goodwill in the workstation market and the computer industry will suffer long-term injury. These are harms that, in the opinion of the court, cannot be recompensed merely by the payment of money because jobs, reputation, and good will, once lost, may never be regained.

### B. Intergraph and the Workstation Market.

Intergraph Corporation was begun as M & S Computing, Inc. in 1969 with three employees for the purpose of providing computer assisted guidance systems to the United States military services, but it soon changed direction toward the development of advanced computer-aided designing and drafting systems, which, as noted above, became known as "workstations." (Meadlock Aff. ¶ 3; Tr. 71).[19] Intergraph's first graphical interface computer was built and sold in 1972.[20] Those early "workstations" were based upon computers Intergraph purchased from Digital Equipment Corporation ("DEC"), which were then integrated with its own automated design software. (Meadlock Aff. ¶ 4). Intergraph developed a "Graphics Processor" in 1982, a component that allowed computer modeling and shading for very high quality images. (Meadlock Aff. ¶ 5).[21]

Beginning in 1986, Intergraph workstations were based upon a then advanced high powered microprocessor called the "Clipper," which was then the property of Fairchild Semiconductor.[22] Upon learning that Fairchild was to be sold, Intergraph purchased Fairchild's Advanced Processor Division ("APD") in 1987, thereby acquiring ownership of the Clipper technology and lessening its own reliance on outside sources for its supply of microprocessors. This purchase also enabled Intergraph to design and build future products more rapidly. Until 1993, Intergraph used the Clipper microprocessor in all its workstations. (Meadlock Aff. ¶ 7).

In the early 1990s, after the computer industry began to shift from the Microsoft

19. Intergraph has approximately 8,500 employees around the world, with approximately 4,500 of those being in Huntsville, Alabama. Its business is conducted through three divisions. The Intergraph Computer Systems Division handles all hardware activities for the company. The Intergraph Software Division creates and markets software applications for the engineering market. The Intergraph Federal Systems Division sells commercial systems to and provides consulting work for the federal government. (Tr. 72).

20. A graphical interface allows the user to operate the system and applications software by using a cursor and screen image instead of using programming languages. (Meadlock Aff. ¶ 4).

21. Mr. Patterson testified:
Back in those early days, you didn't have enough horsepower that you could put it all in one box. So Intergraph made a business selling systems wrapped around Digital Equipment Corporation minicomputers and Intergraph designed a very high-end graphic termals [sic] to work with those. (Tr. 75).

22. Mr. Patterson stated in testimony at the Hearing:
Then in the mid 1980's, Intergraph decided that the horsepower that you would need to have an all in one solution was going to become available and so Intergraph used Fairchild's RISC microprocessor called Clipper and designed an all in one workstation for doing graphics and high-end work within that workstation. That was based on the Unix operating system, not on Windows. Windows wasn't around in those days. (Tr. 75).

DOS to the Microsoft Windows operating system, Intergraph learned that Microsoft planned to create a very high-end operating system to be called Windows NT, and Intergraph became convinced that this new operating system would likely become the dominant operating system for future high-end workstations. Intergraph further concluded that its own future lay with the development of a Windows NT based workstation product to supplement the Clipper (RISC microprocessor)[23] and Unix based operating system (Tr. 76) workstations it was then producing.

In 1992, Intel was, and had been for years, the predominant designer and producer of microprocessors for the "open architecture" PC market, that segment of the market previously called the IBM compatible market. Based on Intel's assurances and representations that Intel's CPUs had the necessary computing power and speed for Intergraph's high-end workstations and that Intel would supply its CPUs to Intergraph on fair and reasonable terms,[24] in late 1992, Intergraph began a major and expensive two-year development and engineering effort to convert its products from incorporating its own Clipper microprocessor to incorporating the Intel microprocessors and to convert its technical software applications to the Microsoft Windows NT operating system. (Meadlock Aff. ¶ 9; Tr. 78–79).

By the end of 1993, Intergraph had discontinued further development of its own Clipper microprocessor, eliminating the Clipper as a competitor of Intel and other producers of microprocessors in the high-end work station market. (Tr. 79–80).[25] Intergraph has, since 1992, invested enormous financial and engineering resources to design and build its products and systems based on Intel's CPUs. As noted earlier, Intergraph cannot for the foreseeable future either economically or technically switch to any other CPU. (Tr. 79–80). As a result of the migration to Intel's CPUs, Intergraph is now technologically and economically "locked-in" to Intel's CPUs for at least the next two to three years. (Patterson Supp. Aff. ¶ 14).[26]

**23.** "RISC" is an acronym for "Reduced Instruction Set Computer," a type of microprocessor designed for faster computers. Intergraph claims ownership to all of the patent rights to Clipper, including patent rights on advanced designs of Clipper, (Meadlock Aff. ¶ 7), though it should be noted that one or more of those patents are at issue in this case and in litigation now pending in the United States District Court for the Northern District of California. In this litigation, Intergraph alleges that Intel has incorporated some of Intergraph's key Clipper technology into Intel's CPUs and infringes Clipper patents owned by Intergraph. *See* Counts 19–21 of Intergraph's First Amended Complaint. According to Intergraph, the internal architecture of Intel's Pentium CPUs incorporate RISC technology covered by the Clipper patents. (Tr. 159–160).

**24.** By affidavit, James Meadlock testified:
In 1993, I personally met with Andy Grove of Intel to discuss Intel's future development plans. Mr. Grove represented to me that Intel's chips would soon have the necessary computing power and speed for the development of an Intergraph workstation. I also expressed my concern with Intel being the sole source supplier of its chips, but was assured by Mr. Grove that Intel was sensitive to such issues and that Intel treated all of its developers fairly and equally. Based upon such representations, the company began development of an Intel-based workstation and discontinued further development of the Clipper and Clipper-based workstations and servers.

(Meadlock Aff. ¶ 9). Mr. Meadlock acknowledged, however, that Mr. Grove did not commit Intel to provide a perpetual supply of chips, pre-released chips, or confidential information. (Tr. at 242–3.) Mr. Meadlock also acknowledged that Mr. Grove did not commit Intel to any continued or "perpetual business relationship" with Intergraph. (Tr. at 243.)

**25.** On direct examination, Mr. Patterson was asked whether Intergraph could now return to its own Clipper based CPU technology, abandoning the Intel product. He answered, "No. All the people [technical staff] are gone and we have not been developing Clipper now for about three years, so there is no way to start that up." (Tr. 80).

**26.** The court is aware that technology in the computer/workstation industry changes so rapidly that what is true today may not be true six months from now. Mr. Patterson stated in his affidavit, "Due to ever-changing chip technology and market demand, Intergraph's workstations have an average market life of six months before the company must release its next generation product." (Patterson Aff. ¶ 16). Today, Intel stands as the victor in the so-called "platform war," dominating the competition between RISC–Unix workstations and Intel–Windows workstations. Currently Intel–Windows workstations outsell RISC–Unix by a ratio of about two to one. (Tr. 212–214). Projections of future market shares indicate sales of RISC–Unix prod-

The court concludes that, before it was induced by the representations of Intel CEO Andy Grove to abandon its own Clipper technology, Intergraph competed successfully in the relevant market for high-end microprocessors. Because of the conduct of Intel, inducing the plaintiff to abandon the Clipper, Intergraph has been eliminated as a competitor in the high-end microprocessor market and is now locked-in to Intel as its sole source of CPUs and relevant technical data. Moreover, the cessation of further development of the Clipper technology may well have diminished further innovation and competition generally because no further efforts were made to improve or advance the Clipper CPU technology.[27]

### C. The Relationship Between Intergraph and Intel.

In 1993, when Intergraph and Intel began their business relationship, it was the practice of Intel to freely share with its OEM customers technical information about its products. (Patterson Aff. ¶ 7; Tr. 83–84).[28] As Intel moved to a closed architecture and Intergraph became dependent upon the use of Intel microprocessors, Intel began insisting that Intergraph and its other customers sign comprehensive Non-disclosure Agreements ("NDAs") and Restricted Use Nondisclosure Agreements ("RUNDAs"). (Meadlock Aff. ¶ 11; Tr. 84–85). NDAs were often accompanied by Confidential Information Transmittal Records ("CITRs"). The CITRs are executed by both parties and identify the specific Intel Confidential Information to be disclosed. The CITRs expressly incorporate the terms of the respective NDA. (Johnson Aff. ¶ 6; Patterson Aff. ¶¶ 8–10; Johnson Aff. Exh. 2.) These Agreements established procedures for exchanging product information that previously had been freely exchanged. (Patterson Aff. ¶ 7; Tr. 84–85). The NDAs, CITRs and RUNDAs were forms prepared by Intel to which it allowed no changes. (Patterson Aff. ¶ 9–10; Tr. 128–29; Johnson Aff. ¶ 6).

The parties signed NDAs, which contain standard provisions including: (1) one provision that expressly negates any obligation on the part of either party to supply confidential information;[29] (2) a second provision that establishes that the NDA does not create a business relationship, joint venture, partnership or other form of business association, between the parties and does not create an obligation on the part of Intel to sell products to Intergraph;[30] and (3) a third provision

ucts will remain flat while Intel–Windows workstations will grow very rapidly. (*Id.*). An industry research company, IDC, projects that Intel's share of technical workstations will surge to eighty-six percent by the year 2000. *See Business Week, supra,* p. 74. Nevertheless, the court is also aware of press reports that IBM will soon demonstrate a new microprocessor that it claims will be more powerful than Intel's Pentium II and will run at speeds of one gigahertz. Thus, assuming IBM can produce what it claims, to say that Intergraph has no alternative to Intel products now is not to say it will have no alternative in the future. The critical point is that it has no practical alternative to Intel products today.

27. That the Clipper technology held some potential for future innovation will be demonstrated if, as Intergraph contends in this lawsuit, Intel has indeed incorporated some of the Clipper RISC technology in the Pentium products.

28. By affidavit, Mr. Patterson testified:
Initially, most of the information necessary to develop products using Intel's chips was provided in product data books. Product data books were generally available from Intel or its distributors. However, as each subsequent generation of chips were made available, the technical information contained in the product data books became less comprehensive. Information which was no longer contained in product data books, but necessary for product development, was migrated into packets of confidential information commonly referred to as "yellow books." The information contained in yellow books was considered by Intel to be confidential information. Intel managed the supply of such yellow books, and the information disclosed therein, through the use of nondisclosure agreements.
(Patterson Aff. ¶ 7).

29. NDA ¶ 6: *"No Obligation of Disclosure.* Neither party has any obligation to disclose Confidential Information to the other. Either party may, at any time, cease giving Confidential Information to the other party without any liability or request in writing the return of Confidential Information previously disclosed."

30. NDA ¶ 8(a): "This Agreement is neither intended to nor shall it be construed as creating a joint venture, partnership or other form of business association between the parties, nor an obligation to buy or sell products using or incorporating the Confidential Information, nor as

that states that the agreement can be terminated at any time without cause.[31] (Johnson Aff. Exh. 1.) Other documents signed by the parties also provide that they create no obligations to supply products or confidential information and to engage in future business activities.[32]

Information supplied by Intel under the NDAs, RUNDAs, and CITRs contained the necessary technical data to provide OEM engineers and designers with the ability to develop their own products. This data would not permit any third party to duplicate Intel's own technology. (Tr. 85, 185–86). There is no evidence that Intergraph has misused

or mishandled Intel's confidential data in any way at all. The record is not to the contrary. (Patterson Aff. ¶ 11–12).[33]

In 1995, Intergraph successfully participated as a "Validation Partner" in the development and release of Intel's Pentium Pro product, (Johnson Aff. ¶ 12), prompting Intel to feature Intergraph's workstations in the "roll out" of the Pentium Pro chip and in its 1995 Annual Report.[34]

In 1997, some OEM customers of Intel made inquiries about whether Intel would indemnify them with regard to claims of patent infringement they had received from Intergraph. (Epstein Aff. ¶ 4; Epstein Aff.

creating an implied or express license grant from either party to the other."

31. NDA ¶ 7: *"Termination and Duty to Return.* Either party may terminate this Agreement at any time without cause upon notice to the other party. However, all obligations of confidentiality shall survive the termination of this Agreement. In the event this Agreement is terminated, and the disclosing party so requests, the receiving party shall promptly return or destroy (and certify destruction of ) all Confidential Information which is received from the disclosing party along with copies which it made."

32. RUNDA ¶ 14(a): "This Agreement is neither *intended to nor shall it be construed as creating* a joint venture, partnership, or other form of business association between the parties, nor an obligation to buy or sell products or services using or incorporating Confidential Information." (Johnson Aff. Exh. 3.)

MERCED DISCLOSURE AGREEMENT ¶ 10: "Neither party warrants that the information that it discloses is necessarily complete. Neither party undertakes to advise the other of any changes in its plans. Neither party shall be obligated to take into consideration any plans of the other or to design any of its products specially to accommodate the products of the other or *to do business with the other in the future."* (Johnson Aff. Exh. 4.)

33. Mr. Patterson stated by affidavit:

As noted, the company has entered into numerous non-disclosure agreements with Intel, for a variety of products and information. The company has maintained the confidentiality of information supplied under such non-disclosure agreements. The company took reasonable precautions to protect the confidentiality of information supplied by Intel, to the satisfaction of Intel. The company has maintained such information in its restricted access facilities, and by only supplying such information to specifically named personnel who needed the

information for development or support efforts.

Intel has never accused Intergraph of violating, or disregarding, any non-disclosure agreement, or improperly disclosing such information. Nor has Intel ever complained to Intergraph about confidentiality or compliance issues pertaining to information supplied under a non-disclosure agreement. In fact, the first time Intel ever raised an issue about information provided under a non-disclosure agreement was after Intergraph refused to grant Intel royalty free rights under the company's Clipper patents. Specifically, I was advised by both Pat Gelsinger and Annand Chandreshaker, on four separate occasions, that Intel would not enter into any future non-disclosure agreements or supply any information normally provided under non-disclosure agreements, unless Intergraph conceded and granted Intel rights under its Clipper patents. Shortly thereafter, Intel first demanded the return of information under (sic) non-disclosure agreement. Even then Intel did not allege that we had failed to comply with the non-disclosure agreements, rather that said they [sic] could unilaterally terminate for any reason at any time.

(Patterson Aff. ¶¶ 11 and 12).

34. Intel's validation partners enjoy a mutually beneficial, but transitory, relationship whereby an Intel customer participates in the developmental testing of a specific Intel product that would potentially be useful for integration into the customer's own product. (Johnson Aff. ¶¶ 11–12). As part of this relationship, the customer receives Intel confidential information with respect to the product, and sample products, before such information and products are available to others. (Johnson Aff. ¶ 11). Intergraph was a validation partner with respect to Intel's Pentium Pro processor, which has now been on the market for approximately two years. (Johnson Aff. ¶ 11). Intergraph has not been a validation partner for any subsequent Intel products. (Johnson Aff. ¶ 12).

Exh. 1). In response, Intel's Senior Licensing Counsel contacted Intergraph about the possibility of negotiating a cross-license arrangement so that Intel and Intergraph each would then have access to certain patent rights held by the other. (Epstein Aff. ¶ 5; Epstein Aff. Exh. 2).

Those negotiations were unsuccessful, and eventually, at some point that is not clear, Intel changed the text of the NDAs it presented to Intergraph for execution in connection with the development of future projects. (Tr. 88–89). Specifically, in those proposed NDAs, Intel inserted a new provision that would have given Intel a license to use all of Intergraph's patented technology without cost. (Patterson Aff. ¶ 12; Tr. 154). When Intergraph asked for the provision, which would license its patented technology to Intel, to be removed, Intel withdrew the proposed NDAs and refused to allow Intergraph to participate in the new programs or to provide any of its confidential information to Intergraph, which was necessary for Intergraph to continue product development. (Tr. 89, 133).

On March 28, 1997, responding to Intergraph's expressed concerns about the relationship between Intel and itself, the defendant's Huntsville, Alabama-based Field Representative, Keith Johnson, provided Allen Braxton, a purchasing agent for Intergraph, a letter in which he confirmed that Intel intended to: (1) treat Intergraph "as a strategic customer in current and future programs;" (2) support Intergraph with "product supply, design, quality, manufacturing and marketing;" and (3) provide Intergraph "the benefit of additional price reductions." [35] (Johnson Aff. Ex. E; Blaxton Aff. ¶ 3–4). In his March 28, 1997, letter Mr. Johnson specifically includes the "Deschutes" and "Merced" programs under development by Intel. (*Id.*). Additionally, the undisputed evidence shows that, at the time of the letter, Intel already had projected "current and future programs" through the year 1999. (Patterson Second Supp. Aff. Ex. C) (filed under seal).

Notwithstanding the representations made by Mr. Johnson on behalf of Intel in the March 28, 1997, letter, Intel continued to propose a cross-license agreement whereby Intergraph would be required to surrender its patent rights in the Clipper related technology. (Tr. 155). The court is not persuaded by Intel's suggestion that its offer to license some of its patents to Intergraph created a *quid pro quo*, a tit-for-tat. (*Id.*). As Mr. Patterson observed, Intergraph no longer has need of the Intel patents because it is no longer in the business of producing microprocessors. (Tr. 155–159).

On August 13, 1997, after Intel was unable to secure the Intergraph patent rights on terms it considered acceptable, it summarily and unilaterally canceled all Intergraph's outstanding NDAs and RUNDAs and demanded the return of all confidential information it had provided to Intergraph. (Veri-

**35.** The entire text of Mr. Johnson's letter was as follows:

This is to confirm Intel's intent of supporting Intergraph as a strategic customer in current and future programs. This support includes product supply, design, quality, manufacturing and marketing.

As a strategic customer, Intel is offering Intergraph the benefit of additional price reductions on all microprocessor products placed direct with Intel. Intel and Intergraph are currently involved in multiple programs efforts. I have outlined several below for your review.

1. Pentium® Processor, Pentium® II Processor and Pentium Pro® Processor production programs.

2. Pentium® Processor, Pentium® II Processor and Pentium Pro® Processor design programs.

3. Development efforts with Intel's next generation microprocessor and chipset technology, i.e., Deschutes, Merced, etc. These are currently being managed under Non–Disclosure.

4. Marketing involvement and new product introduction events. The Pentium® II Processor and Wired for Management efforts being the most recent. Intergraph is also active in the Intel Inside® Program.

It is Intel's intent to assist Intergraph in its efforts whenever possible. These efforts are integral to our respective companies (sic) future success.

Intel's goal is to lead the market in personal computer, workstation and server industry. We look forward to a mutually beneficial business relationship and appreciate Intergraph's continued support toward this goal.

(Intergraph's Preliminary Injunction Motion Exh. 7).

fied Motion Ex. A). Apparently, Intel backed away from its decision to terminate Intergraph's NDAs at that time, because, immediately after Intergraph filed this action, Intel wrote to Intergraph terminating NDAs and demanding the return of all confidential information.[36]

### D. Intel's Conduct with Respect to Intergraph.

#### 1. Intel's Product Distribution System.

Mr. Patterson testified that Intergraph is unable to obtain Production Chips through distributors unless Intergraph has previously obtained an allocation of such chips from Intel. (Tr. 170–73). Mr. Patterson testified that Intergraph has attempted to purchase Production Chips through a distributor and has been informed that such a purchase is not possible unless advance approval is received by the distributor from Intel. (Tr. 173–74). In response to the testimony of Mr. Patterson, Intel submitted the affidavit of Edwin Bauernfreund, who testified that Intel's sales to distributors are based on allotments to the distributors themselves, rather than allotments to the ultimate purchaser. (Bauernfreund Aff. ¶ 3). Mr. Bauernfreund further testified that Intel's microprocessors are generally available through distributors without allocation figures or specific approval from Intel. (Bauernfreund Aff. ¶ 4). Finally, Mr. Bauernfreund stated that there currently is a supply of a particular chip, the Intel Pentium II 300 MHz, through distributors, which is adequate to supply Intergraph's needs of approximately 10–20,000 units per quarter. (Id.).

Intergraph responded to the Bauernfreund affidavit with an affidavit of one of its own employees, Sanford C. Morris, Jr., who formerly was employed by one of Intel's distributors. Mr. Morris stated that Intel's allotments to distributors are directly and specifically related to the ultimate purchaser of the chips, and that distributors lack sufficient inventory to fill customer orders, especially larger orders such as those placed by Intergraph, without a specific allotment and approval from Intel. (Morris Aff. ¶ 3). Kirk Totten, an Intergraph employee who previously was employed by a contract computer manufacturer, testified that Intel sold chips to the contractor for resale to a third party only through specific allotments that identified the ultimate purchaser of Intel's chips. (Totten Aff. ¶ 7). Mr. Totten further testified that, since November, Intergraph has been unable to fill through distributors an order for approximately 5,000 Pentium II 300 MHz chips. (Id. ¶ 8). Allen Blaxton testified that Intergraph has been unable to purchase Intel chips from distributors, which have informed Intergraph that they require a specific allocation in order to sell Intel chips to Intergraph. (Blaxton Supp. Aff. ¶ 3–4).

Mr. Bauernfreund goes on to state that, without an allocation, the new Pentium II processor, the 333 MHz version, will not be available through distributors until 30–90 days after introduction by Intel. (Bauernfreund Aff. ¶ 8). This testimony confirms Intergraph's position that purchasing through distributors is an inadequate means by which it can procure the Production Chips necessary for its manufacturing needs. A 30–90 day delay was described by Mr. Patterson as extremely injurious to Intergraph efforts to maintain a competitive presence in the high-end workstation market. (Patterson Aff. ¶ 16).

The court accepts Mr. Bauernfreund's testimony that Intel does not explicitly "tell" its distributors to whom they may sell Intel Products. (Bauernfreund Aff. ¶ 4). This, testimony, however, begs the ultimate question of whether Intel Product would be available to Intergraph without an allocation from

---

**36.** Intergraph filed this action on Monday, November 17, 1997; in this court. Within hours Intel filed an action in the Northern District of California seeking a declaratory judgment asserting that Intergraph's patents were invalid and that it had not infringed those patents. One week later, Intel filed a second action in the Northern District of California by which it claimed that Intergraph had breached its contract with Intel by refusing to return confidential information that had been provided under the canceled NDAs. On December 1, 1997, the court issued a temporary restraining order to prevent Intel from proceeding with the California law suits. That order was allowed to expire after Intel counsel represented to the court that Intel would not pursue the California actions pending resolution of its motion under 28 U.S.C. § 1404(a). That motion has been filed and briefed and is under consideration by the court.

Intel. On this issue, even Mr. Bauernfreund admitted that Intergraph would fall 30–90 days behind its competitors. Mr. Morris confirms that such delays occur due to inventory shortages. (Morris Aff. ¶ 3). At least as important, advance samples of Intel microprocessors, which are necessary for Intergraph to have its products ready for deployment at the same time as its competitors, are available only from Intel. (Blaxton Supp. Aff. ¶ 5).

The delay conceded by Mr. Bauernfreund would prevent Intergraph from maintaining a competitive presence in the high-end workstation market. Though Mr. Bauernfreund stated generally that there was an "adequate supply" of Intel's previously released 300 MHz Pentium II available (Bauernfreund Aff. ¶ 7), the available evidence is to the contrary. In late November Intergraph sought to purchase 5,000 such microprocessors for delivery in February and was told repeatedly that this small quantity was not available. (Totten Aff. ¶ 8).

### 2. Intel, Intergraph and Essential Facilities.

Before mid–1996, Intel and Intergraph enjoyed a mutually beneficial business relationship. As a result of this relationship, Intel regularly provided Intergraph with CPUs, technical information, and support essential for Intergraph to be competitive in its chosen field. Intel regularly supplied Intergraph with early samples of its CPUs for testing and development, often within weeks of their first production. (Phillips Aff. ¶ 4–5). Intel provided motherboard design assistance, and it reviewed Intergraph's design schematics to ensure that any "bugs" or defects in the Intel CPU or chips were avoided. *Id.* Intel provided detailed information on its technology and future plans, and it solicited Intergraph information and technology for incorporation into future Intel designs. *Id.* Intel provided advance information on its own design and development efforts, and it supported Intergraph's development efforts. *Id.*

The court finds that essential to Intergraph's competitive survival is for it to have access to Intel's CPUs, Advance Chips Samples, and advance technical and design assistance and information as quickly as possible and no later than Intergraph's competitors.[37] (Meadlock Aff. ¶¶ 13–16; Patterson Aff. ¶¶ 13–17).

37. In his affidavit, Terry Phillips, Manager of Workstation Development for Intergraph for some three years, described the manner in which Intergraph and Intel had previously worked together:

I have worked directly with Intel's technical support personnel to obtain advance technical information and ongoing development assistance for the development of Intergraph's workstations. I have also worked with Intel's technical support personnel to obtain information on Intel defects and corrections for Intel products incorporated into Intergraph's workstations. Additionally, I have worked with Intel's local representative in Huntsville, Keith Johnson, to obtain early releases of advance product samples for workstation development. All of which are necessary for continued development and support of Intergraph's workstations.

Intel has supplied Intergraph with advance technology, product information and advance product samples since 1993 as an integral part of Intergraph's purchase of Intel chips. The technical information and advance product samples are essential for the incorporation of Intel's products into Intergraph workstations, "debugging" Intel's chips, and providing support to Intergraph customers. For instance, new shipments and revisions of microprocessors and chips generally contain new technical information made available under a non-disclosure agreement, including information on debugging and errata as such problems become known to Intel. Intel's products cannot be utilized without this essential product information, much of which was provided in years past to the general public in "data books," but which now is parceled out through non-disclosure agreements.

Intel supplied advance technical product information and support, as well as early releases of advance product samples until about August 1997. Since August, Intel has refused, or delayed, access to product information, defect and defect correction information, technical support and advance product samples. As a result, Intergraph has had to expend significant time and resources to work through development issues and delays caused by Intel's refusal to supply such necessary technical information and support. Further, Intergraph has been significantly delayed in releasing previously announced workstation products. If Intel is permitted to continue to withhold advance technical information and support, Intergraph will be unable to properly utilize the product obtained from Intel, and unable to correct defects in Intel's products or errors in Intergraph's designs based upon such defects.

The court also finds that Intel has no legitimate business purpose in refusing to deal with Intergraph in accordance with the previously established business relationship between the parties, especially in view of Intel's exclusive control of the CPUs used by Intergraph and the complete lack of feasible alternatives available to Intergraph. The patent dispute that arose between the parties could and should be resolved without linking it to the supply of products and information that are essential to Intergraph's business survival.[38]

The court finds that the Advance Chips Samples and advance design and technical information are essential products and information necessary for Intergraph to compete in its markets. Denial of these products and information will seriously impair Intergraph's competitive ability, thereby severely injuring Intergraph as a competitor and injuring competition generally.

### 3. The Graphics Subsystem Market.

An essential component of Intergraph's business is the design and production of graphics subsystems. These are critical systems for high-end workstations, which provide high performance 2D or 3D graphics capabilities essential to the work of design and graphics engineers, as well as graphics artists. Intergraph designs its own graphics cards and motherboards to create its high performance graphics subsystems. (Patterson Supp. Aff. ¶¶ 3–6).

Intel has entered the graphics subsystem market (Patterson Second Supp. Aff. Ex. C (filed under seal)) and is now a direct competitor of Intergraph in that market. Intel has recently signed an agreement to purchase Chips & Technology Company, an experienced and successful producer of graphics chips and chip sets. (Patterson Supp. Aff. ¶ 7). The proposed acquisition of Chips & Technology is currently being reviewed by federal antitrust regulators. Intel has also entered into a joint development relationship to form a company called Real 3D, Inc. to create 3D graphics technology. Intel has already incorporated graphics technology, called MMX, into its own CPUs. (Tr. 67–68; Patterson Supp. Aff. ¶ 7). Intel has announced that its motherboard graphics subsystem will be available in early 1998. *See* December 12, 1997, Article "Intel's Graphics Chip Due Soon;" (Tr. 67–68). By withholding advance CPU samples and essential design and technical information from Intergraph, Intel restrains Intergraph's ability to compete in the graphics subsystem market and may be using its monopoly power in the "x86" CPU market to obtain a monopoly in the graphics subsystem market.

The motherboard and graphics subsystems markets are fast-evolving, high technology markets. Users of high-end workstations such as those produced by Intergraph and others demand the most current and best performing technology available. If these consumers cannot get the most advanced product from Intergraph, they will get it from Intergraph's competitors who have not been denied access to the advance information, sample chips, and production chips that Intel has denied to Intergraph. By its conduct toward Intergraph, Intel threatens to substantially restrain actual and potential competition in the graphics subsystem market. The effect of Intel's conduct may be to leverage its monopoly in the "x86" CPU mar-

---

Intergraph cannot continue to develop competitive workstation products without a sustained supply of microprocessors, chips, early release product samples, and technical product information and support. Further, Intergraph cannot continue to support customers utilizing Intergraph's Intel-based workstations, without ongoing technical support and defect information and assistance.

Without a sustained supply of microprocessors, chips, early release product samples, technical information and support, Intergraph will not be able to supply competitive workstation products or ongoing support, and will lose its significant technological lead, reputation and goodwill in the highly technical workstation market.

(Phillips Aff. ¶¶ 4–8).

**38.** The conduct of Intel in this dispute contrasts sharply with that of IBM. Mr. Patterson testified that Intergraph and IBM have been engaged in a continuing dispute over their respective patent rights. That dispute has apparently not risen to the level of litigation but, in any event, Intergraph and IBM continue an amicable and profitable business, each being a customer of the other.

ket and to create a monopoly power in the graphics subsystem market.

### 4. Intel's Use of NDAs to Coerce Intergraph.

Intel provides its products, as well as technical and design information, to Intergraph under NDAs, which are terminable at will by Intel. These NDAs are documents drafted by Intel and presented to Intergraph and other customers on a take-it-or-leave-it basis. Intel simply dictates the terms under which it provides its products and design information to customers such as Intergraph. (Patterson Tr. 128–130).

The evidence suggests strongly that Intel has used the threatened or actual termination of NDAs as a contractual weapon, coercing customers such as Intergraph to accede to Intel's demands and restraining competition. The court takes judicial notice of the fact that, when Intergraph and Digital Equipment separately asserted their patent rights against Intel, Intel immediately used the termination provisions of their respective NDAs to deny both Intergraph and Digital further technical information, samples, and products and demanded the return of all Intel confidential information provided to them. *See Intel v. Intergraph* and *Intel v. DEC* lawsuits. Also, the court takes judicial notice of the current government antitrust investigation of Intel by the Federal Trade Commission involving allegations of similar conduct by Intel in withholding crucial technical or design information or terminating NDAs to restrain competition. (Verified Motion Ex. D).

In view of Intel's previous policy of providing much of the same type of information now subject to NDAs in a much less restricted manner and in view of the fact that Intel has offered no reasonable explanation of any present need for the use of the NDAs, it seems reasonable to conclude that Intel's present use of one sided and terminable-at-will NDAs and its retaliatory cancellation of

the NDAs are unreasonable and anticompetitive contractual restraints using Intel's monopoly in CPUs and related design and technical information. Furthermore, the chilling effect which Intel's arbitrary enforcement of the NDAs in this manner must have on other members of the industry, who are dependent upon Intel for microprocessors, is obvious.

Other than Intel's position that it does not wish to do business with those who sue it (Tr. 313—314), the court perceives of no rational or legitimate business reason why Intel would immediately terminate its NDAs with Intergraph. As noted before, there is no suggestion in the record that Intergraph has failed in any way to fully honor and comply with its obligations of confidentiality under the NDAs.

### 5. Intel's Conduct to Restrain Competition in the Graphics Subsystem and Workstation Markets.

Intergraph will likely prove that Intel has recently entered into agreements, conspiracies and combinations with Intergraph's competitors and suppliers to restrain competition from Intergraph in the graphics subsystem and workstation markets. Intel has offered Intergraph customers in the digital media market funding for projects or other support on condition that such customers use workstations from Intergraph's competitors and that they not deal with Intergraph. (Patterson Supp. Aff. ¶ 8; Tr. 91–93). Intel has agreed with competitors of Intergraph, such as Compaq and NetPower, to make joint presentations to Intergraph's customers to convince them not to deal with Intergraph and to buy from Intergraph's competitors instead. (Tr. 199–201).

Intel has used the termination of a three-way NDA to prevent a test equipment supplier from doing business with Intergraph, to prevent that supplier from providing needed test equipment to Intergraph, and to prevent Intergraph from fixing a "bug" in Intel's product.[39] Moreover, Intel refused to pro-

---

**39.** The evidence was that after Intel refused to provide Intergraph with technical data required to "fix" a bug in one of its processors, which prevented the computer from being turned off, Intergraph sought to purchase certain equipment from Tektronix, a manufacturer and provider of test machines, so that it might analyze and "fix" the bug without the aid of Intel. Because Intel had canceled its NDAs and three-way NDAs with

vide information to Intergraph, which was needed to fix the "bug," requiring Intergraph to spend substantial time and resources to solve the problem and delaying Intergraph's product entry into the market. (Tr. 205–211). The court can find no legitimate business justification for Intel's conduct. By preventing Intergraph from acquiring the data necessary to fix the "bug," Intel failed to comply with its own warranties and contractual obligations.

The court also finds that Intel has attempted to leverage its monopoly power in the "x86" CPU market to prevent Intergraph from competing in the graphics subsystem and workstation markets and to control and dominate competition in these markets through discriminatory and favored agreements and understandings with some of Intergraph's competitors. This reduces competition in the markets in which Intergraph competes, depriving customers of alternative and improved technology in these markets, stifling innovation, reducing competition in price and quality, and impairing competition generally.

### 6. Intel's Conduct Toward Intergraph Since the Hearing.

Intel originally promised Intergraph that it would deliver samples and technical information pertaining to Intel's latest microprocessor (code named "Deschutes") by December 15, 1997. Those samples were not delivered to Intergraph until January 26, 1998, the date on which Intel publicly released that product as the 333 MHZ, "Pentium II" microprocessor. That same day, Intergraph's competitors announced that they had Deschutes-based workstations available for delivery. Likewise, based upon the assurances of Keith Johnson, as reaffirmed by the affidavit of Mr. Bauernfreund, Intergraph also announced that its TDZ 2000 workstation would incorporate the new 333 MHz Pentium II

Intergraph, Tektronix refused to sell the test equipment to Intergraph. (Tr. 204–06).

**40.** BIOS is an acronym for Basic Input Output System. It is the most basic level of software which provides communications services between the CPU and other hardware components of a computer.

microprocessors. (Second Meadlock Aff. ¶ 6).

On January 26, 1998, however, Mr. Johnson, at a meeting at Intergraph in Huntsville, Alabama, informed Intergraph, for the first time, that Intel would not honor its commitment to supply Intergraph with technical design, defect or user information pertaining to the newly released Deschutes processors. Mr. Johnson also advised Intergraph that Intel would not supply Intergraph with the revised Deschutes "BIOS" code.[40] As a result, Intergraph lacked the information and software necessary to complete the system integration of the Deschutes processor and a third-party motherboard for the TDZ 2000. (Phillips Aff. ¶ 5). Mr. Johnson further advised Intergraph that the only information that would be made available to it was the information already available on Intel's publicly accessible site on the World Wide Web, information that did not include the technical data necessary to design or support Deschutes/Pentium II-based products. (Dobbins Aff.) Mr. Johnson even refused to give Intergraph the address of the Intel Web Site[41] containing the public information. (Dobbins Aff.).

Subsequent to the Huntsville meeting with Mr. Johnson, Intergraph requested a copy of the revised BIOS from the BIOS developer, but it was told that Intel had instructed the developer to withhold the BIOS from Intel's customers. Intergraph was able to acquire a copy of the BIOS from a local Intel distributor, but still has not been supplied with the necessary Deschutes technical information. (Elliott Aff. ¶ 3, Greg Vance Aff. ¶ 3.) As a result, Intergraph still cannot complete a deliverable Deschutes-based product. (Phillips Aff. ¶ 5, Ellard Aff. ¶ 5, Farmer Aff. ¶¶ 3, 4, Elliott Aff. ¶ 3).

**41.** The court is not impressed that withholding this readily available web site address was significant except to the extent that it demonstrates the level of Mr. Johnson's own animus toward Intergraph. His attitude may or may not reflect that of his superiors at Intel, though the court is impressed with the manner in which Intel apparently plays "hard ball" with those who cross it.

With respect to other Deschutes-based products, Intergraph had to cancel several motherboard developments and the F5 server project. (Phillips Aff. ¶ 3, 4, Hall Aff. ¶ 3, Worden Aff. ¶ 3). Intergraph has also been compelled to contract with third-party manufacturers on an emergency basis to design and build mother boards so that it will have some product to offer. Third party contracting delayed Intergraph's ability to get a competitive product to market, and will yield motherboards and systems which are not specifically tailored to Intergraph's needs. (Ellard Aff. ¶ 5, Farmer Aff. ¶ 3, Vance Aff. ¶ 3)

Because Intel has continued to withhold technical information from Intergraph, the plaintiff has no Deschutes-based "next generation" products available. (Ellard Aff. ¶ 5, Elliott Aff. ¶ 3.) According to Mr. Meadlock, Intel's refusal to deal continues to further erode Intergraph's goodwill and reputation with its customers and the industry. (Meadlock Aff. ¶ 6.) The termination of Intergraph's Deschutes-based projects is irreparably effecting Intergraph's future product development, "[a]nd the effect of that is going to be to put Intergraph in a position where it cannot compete in its market." (Transcript page 232, lines 1–3.)

### III. Monopoly Power and the Relevant Market.

In addition to the relevant market of high performance microprocessors (or "CPUs"), the court finds that Intel CPUs are a separate relevant product market or relevant submarket based on the following facts:

(a) Intel's Pentium CPUs and Intel's next generation CPUs (such as Deschutes and Merced) are not interchangeable with other CPUs; (Tr. 64–65);

(b) Intel's Pentium CPUs have performance capabilities that surpass the performance of other CPUs; (Tr. 70–71);

(c) Intel has enormous brand recognition and appeal among consumers, who demand an Intel CPU, and end-user consumers do not consider other systems to be substitutes or alternatives. (1996 Intel Annual Report 1996); [42]

(d) Once customers are technologically and financially locked-in to an Intel CPU, they cannot feasibly switch to an alternative CPU. (Patterson Supp. Aff. ¶ 14);

(e) Intel has a huge installed base of customers locked in to Intel's network. This creates network barriers, compatibility barriers and increasing returns to scale [43] that further entrench Intel; and

(f) Intel has deliberately designed its related CPU architecture (such as proprietary sockets) to prevent other CPUs from being compatible, thereby converting its CPU architecture from an "open" to a "closed" system; (Tr. 85).

It is self-evident, as admitted by Intel's counsel, that Intel has a 100 percent absolute monopoly of Intel CPUs. (Tr. 262).

There are enormous and extreme financial and technological barriers to entry so that no other company can feasibly enter the relevant market and provide effective competition to Intel. IBM and Motorola unsuccessfully attempted to compete with Intel with the PowerPC CPU. But Microsoft no longer supports the PowerPC with a compatible Windows program, so it is not an alternative. (Tr. 165–166). Counsel for Intel alluded to the Alpha CPU, owned by Digital Equipment Corporation, as a potential competitive CPU, but the court takes judicial notice of published reports of the settlement between Intel and Digital giving Intel ownership and control of Alpha.

Based on the foregoing facts, the court finds that Intel has monopoly power in the relevant market of high performance CPUs

---

**42.** Because of the demand for Intel's newest generation CPUs, Intel operates an allocation system to control supply of CPUs to its customers. (Keith Johnson Aff. ¶ 16).

**43.** See Section V.A.1.e, *infra*, for discussion of "returns to scale" as a basis for finding the existence of monopoly power.

and the separate relevant market of Intel CPUs on a worldwide basis.

### IV. Harm to Intergraph and Hardship to Intel if the Injunction is Granted.

As the court has found, Intergraph has no viable alternative to Intel's Pentium II microprocessor for its high-end computer workstations. Because it has no such alternative, there is no way Intergraph can mitigate the harm it faces from Intel's conduct during the foreseeable pendency of this lawsuit. Intergraph has established to this court's satisfaction that Intel dominates the high-end Windows-based workstation market in which Intergraph operates and in which Intergraph has built its reputation. (Tr. at 96–97; Patterson Aff. ¶¶ 18–19).

Intel advanced technical information, samples, and products, which are distributed through the use of NDAs, are all necessary to Intergraph's survival as a competitor in the high-end computer work station market, which depends upon its ability to adequately service and provide customer support for its existing products, as well as its ability to create, manufacture, and sell competitive products in the future. (Patterson Aff. ¶ 16; Tr. at 97). Adequate supplies of Intel Production Chips are necessary to Intergraph's manufacturing operations because of its technological and economic lock-in to Intel. Virtually all of Intergraph's manufacturing is dedicated to the production of Intel-based computers and graphics subsystems. (Meadlock Aff. ¶ 15). Intel Chips Samples and Early Release Chips are critical to Intergraph's development of new products, and, particularly because of the short shelf life of these products, those Chips Samples and Early Release Chips are critical to Intergraph's ability to compete. For instance, while the Pentium II 300 MHz processor was the fastest and most powerful microprocessor available in the Windows-based workstation market at the time of the Hearing, the testimony indicates that Intel planned to release a faster version in January 1998.[44] (Tr. 55–56). Competitors of Intergraph apparently

have already received substantial lead time in developing new workstations based upon Early Release Chips and Chips Samples. (Meadlock Aff. ¶¶ 13–14; Patterson Aff. ¶¶ 14, 17, 21).

The court is persuaded that disruption in the supply of Intel Products will adversely affect Intergraph's relations with its customers, employees, shareholders, creditors, distributors and suppliers. (Meadlock Aff. ¶ 16; Patterson Aff. ¶¶ 23, 25; Blaxton Aff. ¶ 7; Floyd Aff. ¶¶ 3–5; Phillips Aff. ¶ 8; Ellard Aff. ¶ 7; Tr. at 97–100). Disruption in the supply of Intel Products has the serious potential of shutting down the development and manufacturing efforts at Intergraph, potentially causing the loss of thousands of jobs. (Tr. 99; Meadlock Aff. ¶ 17; Patterson Aff. ¶ 22).

Some of Intel's actions directed against Intergraph in 1996 and early 1997 were in response to Intergraph's refusal to license its Clipper patent rights. Apparently, that conduct was exacerbated and continued because Intergraph filed the present lawsuit. Recent events demonstrate that the potential damage to Intergraph in terms of loss of good will, harm to reputation, and other losses is difficult, if not impossible, to calculate. Intel's counsel has admitted that Intel withheld Information from Intergraph on "bug" problems with Intel Chips in the fall of 1997. *See* December 5, 1997, Letter from Intel's counsel. Intel's failure to detect a design problem as simple as turning a computer on and off cost Intergraph thousands of design hours. Further, Intel then failed to provide Intergraph with curative information and later denied Intergraph access to testing equipment. (Tr. 89–91; 210–212). Because of Intel's conduct, Intergraph was delayed in getting its TDZ 2000 products to the market. (Floyd Aff. ¶ 4). Most recently, Intel reneged on its commitment to supply the Deschutes Chips Sample in mid-December of 1997. (Blaxton Aff. ¶ 5). The effect of this delay is to put Intergraph materially behind its competitors.

---

**44.** In fact, the court takes judicial notice that Intel has released a 333 mhz. version since the Hearing.

In 1996, Intel reported net earnings of Five Billion Dollars ($5,000,000,000), while Intergraph reported a net loss of Sixty–Nine Million Dollars ($69,000,000). Intergraph has improved its system sales for 1997, as its sales of high performance workstations were projected to increase by eighty percent over 1996 sales. (Tr. 215). These are the very workstations that are dependent on Intel Products.

Given Intel's position as the exclusive supplier of microprocessors in this market, the court finds that Intel's actions are likely to cause harm to Intergraph that would thwart this court's ability to provide meaningful relief at the conclusion of this action, should Intergraph prevail on its claims. On the other hand, if the injunction is issued, Intel will be required to do nothing more than what it willingly, and apparently profitably, did with Intergraph for several years. It will merely be required to engage in business with Intergraph on substantially the same terms that it did between 1993 and 1997 and on substantially the same terms it does with others in the computer industry today. The balance of the harm to Intergraph and the hardship to Intel weighs heavily in favor of issuing the injunction.

## V. Conclusions of Law.

### A. Section II of the Sherman Anti–Trust Act.

Section 2 of the Sherman Anti–Trust Act (" § 2") provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....." 15 U.S.C. § 2. In order to prevail on its § 2 monopolization claim, Intergraph only needs to establish that Intel (1) possesses monopoly power in the relevant market and (2) has willfully acquired or maintained that power. *Eastman Kodak v. Image Technical Services, Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 2089–90, 119 L.Ed.2d 265 (1992) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). The court concludes that Intergraph has estab-

lished a substantial likelihood of proving both elements at trial.

### 1. Intel Monopoly Power.

### a. The Relevant Market.

Based on the Findings of Fact, the court concludes there are two relevant markets in which Intel has monopoly power: (a) the relevant market for high performance microprocessors or CPUs and (b) the separate relevant market for Intel CPUs. Intel's counsel conceded the first relevant market at the Hearing. (Tr. 289: "I think there is one market which is a market for CPUs or microprocessors that are supplied to high-end workstations.").

The court concludes that Intel CPUs are also a separate relevant market under well-established criteria for determining relevant markets. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 998 (11th Cir. 1993) (holding that the market for a premium-priced anchor, which is part of a broader anchor market, constituted its own relevant market); *Los Angeles Mem. Coliseum Comm'n v. National Football League,* 726 F.2d 1381, 1393 (9th Cir.1984), *cert. denied sub. nom., Oakland–Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *Eastman Kodak,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (Kodak spare parts are a separate relevant market).

### b. Intel's Extraordinary Market Share.

Intel's extraordinarily high market shares in the relevant markets clearly exceed the legal threshold for presumptive monopoly power. In the market for Intel CPUs, Intel has an absolute monopoly of 100 percent of the market. In the market for "x86" CPUs, Intel has a ninety percent share of the market. These shares alone support the court's conclusion that Intel possesses monopoly power in the relevant markets. A sixty to sixty-five percent market share establishes a prima facie case of market power and creates a genuine issue of dangerous probability of monopolization. *U.S. Anchor,* 7 F.3d at 999; *see also United States v. Microsoft Corp.,* 980 F.Supp. 537 1997 U.S. Dist. LEXIS 19496

(approximately eighty percent market share in PC operating system software constitutes monopoly power); *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (eighty percent market share is a "substantial monopoly" and eighty-seven percent "leaves no doubt" of monopoly power).

### c. Intergraph is Technologically and Economically "Locked–In" to Intel's Microprocessor and Technical Information.

Because Intergraph has re-designed its workstation program around Intel's microprocessor—in reliance on Intel's representations that it would be a reliable source of technical information and technology to Intergraph—Intergraph is "locked-in" to Intel's microprocessor technology and cannot feasibly switch to other microprocessors. Intel's other customers are similarly "locked-in." This reinforces and magnifies Intel's monopoly power. *Eastman Kodak*, 504 U.S. at 477 (antitrust concerns are heightened where "locked-in" customers cannot readily switch to alternative technology).

### d. Customer Loyalty To Intel Enhances Its Monopoly Power.

Strong customer brand loyalty is an impediment to competition, aids the exercise of market power and facilitates monopolization. *U.S. Anchor*, 7 F.3d at 998; *see also United States v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 392–93, 76 S.Ct. 994, 1005–06, 100 L.Ed. 1264 (1956); *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150, 1154 (6th Cir.1980). Intel clearly has brand identification through its "Intel Inside" program and other brand recognition that reinforces and magnifies Intel's monopoly power. Intel enjoys the extraordinary loyalty of its customers with almost all purchasers of personal computers and the great majority of workstation buyers insisting upon having a genuine "Intel Inside" their computers.

### e. Intel's Large Installed Base And Network Of Customers Further Enhances Its Market Power.

As the installed base of Intel-based computers, servers, and workstations increases, Intel's market power is magnified, entry barriers are raised higher, and competitors are foreclosed from the market. *See United States v. Microsoft*, 56 F.3d 1448 (D.C.Cir. 1995), *on remand*, 1995–2 Trade Cases ¶ 71,-096, 1995 WL 505998 (D.D.C.1995) (increasing returns to scale represent a significant entry barrier in computer software market to compete against Microsoft with its large installed base; antitrust consent decree approved). This factor also supports the court's conclusion that Intel possesses monopoly power in the relevant markets. A rapidly evolving high technology market such as microprocessors provides a market environment favorable to increased concentration of market power. *Greyhound Computer Corp., Inc. v. IBM*, 559 F.2d 488, 497 (9th Cir.1977) ("But rapid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.")

The court concludes that the combination of all the foregoing factors establishes that Intel has monopoly power as a matter of law in the two microprocessor relevant markets.

### 2. Intel has Willfully Acquired and Maintained Its Monopoly Power.

The second element of a § 2 monopolization violation is the willful acquisition or maintenance of monopoly power. The court concludes that the facts amply establish this element. "Market power is the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 464. This describes Intel's power and the exercise of this power in the relevant markets in this case, for it strongly appears that Intel has attempted to coerce Intergraph into relinquishing its intellectual property rights as a condition of Intel permitting Intergraph to continue as a competitor in the high-end graphics workstation market. Intel induced Intergraph to discontinue the use and further development of its then competitive Clipper microprocessor. Intel has won the microprocessor platform competitive war and dominates the high-performance CPU market.

■ Because Intel is a monopolists, the law imposes upon it affirmative duties to refrain from acting in a manner that unreasonably harms competition. It is not necessary for Intergraph to establish that Intel acquired its monopoly unlawfully. It is enough to show that Intel has misused or maintained that monopoly, even if lawfully acquired. "[T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *U.S. v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

■ Even conduct by a monopolist that is otherwise lawful may violate the antitrust laws where it has anticompetitive effects. *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1207 (9th Cir.1997) ("Legal actions, when taken by a monopolist, may give rise to liability, if anticompetitive."); *Greyhound Computer v. IBM*, 559 F.2d 488, 498 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (otherwise lawful conduct may be unlawfully exclusionary when practiced by a monopolist); *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 811 (3d Cir. 1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) ("When a monopolist competes by denying a source of supply to his competitors, raises his competitor's price for raw materials without affecting his own costs, lowers his price for finished goods, and threatens his competitors with sustained competition if they do not accede to his anticompetitive designs, then his actions have crossed the shadowy barrier of the Sherman Act."); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) ("Because of a monopolist's special position the antitrust laws impose what may be characterized as affirmative duties.").

■ Accordingly, the court concludes that Intel has violated its affirmative duties as a monopolist not to misuse its monopoly power and to compete in a manner that does not unreasonably or unfairly harm competition. Moreover, the court has concluded that Intergraph is likely to prevail on its § 2 monop-

olization claims under one or more established theories of antitrust liability discussed below and that the preliminary injunction is due to be granted.

## B. Intel's Unlawful Refusal to Deal and Denial of Access to Essential Facilities.

■ A refusal to deal "may be unlawful because a monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Co. v. American Tel. & Tel.*, 708 F.2d 1081, 1132 (7th Cir.1983), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Courts have held that the antitrust laws protect customers and purchasers in cases when a monopolist refuses to deal in order to control a downstream market or to frustrate litigation. *Image Technical Services*, 125 F.3d at 1211 (supplier's refusal to deal with its "customers" in order to control a downstream market); *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 726 (3d Cir.1962) (preliminary injunction granted where defendant drug company refused to sell its products to "purchasers" on the same terms as they are sold to other purchasers).

■ The antitrust laws impose on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms. *MCI Communications Corp.*, 708 F.2d at 1132; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *reh'g denied*, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (access to essential facility must be granted by ski lift owner controlling seventy-five percent of the ski lifts); *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1420 (11th Cir.1987) (Omni arena was unique facility with substantial economic advantages; lack of viable alternative arenas gave the owner substantial market power).

■ Intel's advanced CPUs and Intel's technical information are "essential" if they

are vital to competitive viability and competitors cannot effectively compete in the relevant market without access to them. *City of Anaheim v. Southern Calif. Edison Co.*, 955 F.2d 1373, 1380 n. 5 (9th Cir.1992) (a facility is "essential" if it is otherwise unavailable and cannot be "reasonably or practically duplicated"). Intel's Advanced Chips Samples, Early Release Chips and Technical Information need not be indispensable, but their denial must "impose a severe handicap on potential market entrants." *TCA Bldg. Co. v. Northwestern Resources Co.*, 873 F.Supp. 29, 39 (S.D.Tex.1995).

 Reasonable and timely access to critical business information that is necessary to compete is an essential facility. *Bellsouth Adver. & Publ'g Corp. v. Donnelley Inf. Pub., Inc.*, 719 F.Supp. 1551, 1566 (S.D.Fla.1988), *aff'd*, 933 F.2d 952 (11th Cir.1991). Furthermore, a monopolist's unilateral refusal to deal violates § 2 of the Sherman Act where such conduct unreasonably handicaps competitors or harms competition. *Image Technical Services*, 125 F.3d at 1209.

Accordingly, the court concludes that Intel's refusal to supply advanced CPUs and essential technical information to Intergraph likely violates § 2 of the Sherman Act, because they are not available from alternative sources and cannot be feasibly duplicated, and because competitors cannot effectively compete in the relevant markets without access to them. Moreover, the court concludes that Intel has no legitimate business reason to refuse to deal with Intergraph. Intergraph has been a loyal and beneficial customer of Intel. The dispute over Intergraph's patent claims could be resolved separately without Intel denying Intergraph the essential CPUs and technical information it needs.

## C. Intel's Unlawful Monopoly Leveraging.

 The court also finds that Intel has improperly used its monopoly power in microprocessors to extend or leverage its power into the markets for graphic subsystems and workstations in which Intergraph competes. *Eastman Kodak*, 504 U.S. at 479 n. 29 ("The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next."). Unlawful monopoly leveraging occurs where a firm uses its market power in one market to gain competitive advantage in another market other than by competitive means. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) ("The use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market.").

 The requirements for liability under a monopoly leveraging claim include: "[m]onopoly power in one market; the use of that power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another market; and injury caused by the challenged conduct." *Grand. Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir.1985); *see also Kerasotes Mich. Theatres v. National Amusements, Inc.*, 854 F.2d 135, 136–37 (6th Cir.1988), *reh'g denied*, (1988), *cert. dismissed*, 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989).

Recently, in *United States v. Microsoft*, 980 F.Supp. 537 1997 U.S. Dist. LEXIS 19496, the court concluded that a preliminary injunction was proper because of the danger that Microsoft would be able to leverage its existing monopoly in the computer operating systems market over the market for Internet browsers. "The probability that Microsoft will not only continue to reinforce its operating system monopoly by its licensing practices, but might also acquire yet another monopoly in the Internet browser market, is simply too great to tolerate indefinitely.... Those practices should be abated until it is conclusively established that they are benign." *Microsoft*, 980 F.Supp. at 544 1997 U.S. Dist. LEXIS at 23. This court similarly concludes that Intel is unlawfully using its monopoly in the high-performance CPU relevant market to foreclose or restrain competition by Intergraph in the graphic subsystem relevant market. Intel has already entered

that market and has clearly announced plans to expand in that market while at the same time denying Intergraph access to the CPUs and technical information it needs to compete. This will unnecessarily "handicap" or restrain Intergraph's ability to compete in that market.

## D. Intel's Unlawful Coercive Reciprocity.

Coercive reciprocity refers to the practice of using economic leverage in one market coercively to secure competitive advantage in another. *Betaseed, Inc. v. U and I, Inc.*, 681 F.2d 1203, 1216 (9th Cir.1982) ("coercive reciprocity presupposes the existence of economic leverage in one market to gain an unfair advantage in another ...."). Courts have held that coercive reciprocity is a *per se* violation of the antitrust laws because of its pernicious effect and economic similarity to illegal tying cases. *See Id.* at 1216–17; *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425 (5th Cir.1978), *cert. denied*, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979). According to the Ninth Circuit:

> [B]ecause the labels tie-in and coercive reciprocal dealings refer to similar phenomena, coercive reciprocal dealings should be judged according to the standards applied in a *per se* tie-in analysis.... [In] our view, the malevolent economic results of market foreclosure and raising of artificial entry barriers in a market tinged with coercive reciprocity evinces the anticompetitive and predatory nature of the practices.

> \* \* \* \* \* \*

> The two labels (tying and reciprocal dealings) refer to similar phenomena. In each case one side of a transaction has special power in the market place. It uses this power to force those with whom it deals to make concessions in another market.... In both cases, the key is the extension of economic power in one market to another market.

*Id.* at 1216–17, 1221. *See also Spartan Grain & Mill*, 581 F.2d at 425. Once a plaintiff has established a prima facie case of a *per se* violation, no specific showing of

anticompetitive effect is necessary. *Betaseed, supra*, 681 F.2d at 1228.

Accordingly, the court concludes that Intel's overall course of conduct, including its tying of a continued supply to Intergraph of CPUs and technical information with its demand for Intergraph's relinquishment of its Clipper technology patents without costs to Intel, is a form of coercive reciprocity proscribed under both §§ 1 and 2 of the Sherman Act.

## E. Intel's Use of Patented Technology to Restrain Trade.

That Intel owns patent rights to its CPUs does not confer upon it a privilege or immunity to violate the antitrust laws. Patent rights do not "confer an absolute immunity from antitrust claims." *Image Technical Services*, 125 F.3d at 1216 (citing *Eastman Kodak*, 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29). Unlawful "exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copyright or to sell a patented or copyrighted work." *Image Technical Serv.*, 125 F.3d at 1218 (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir.1994)).

A monopolist cannot use the pretext of protecting intellectual property in order to violate the antitrust laws. *Image Technical Serv.*, 125 F.3d at 1218–1219 ("Neither the aims of intellectual property law nor the antitrust laws justify allowing a monopolist to rely upon a pretextual business justification to mask anticompetitive conduct.")(citing *Eastman Kodak*, 504 U.S. at 484, 112 S.Ct. at 2091).

The Court concludes that Intel has no legitimate intellectual property basis with which it can refuse to supply Intel microprocessors and technical information to Intergraph, especially since Intel has been doing so for the last four years on a mutually beneficial basis.

## F. Intel's Retaliatory Enforcement of the NDAs.

Contracts used as part of an anticompetitive scheme are unlawful under the antitrust laws. *CVD, Inc. v. Raytheon Co.,*

769 F.2d 842, 854–55 (1st Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) ("the policies expressed in the federal antitrust laws will override any agreement in contravention of those policies, regardless of the agreement's legality under private contract law").

The Court concludes that Intel's retaliatory lawsuits and the threatened and actual termination of its nondisclosure agreements (NDAs) with Intergraph, under which Intel provided technical information to Intergraph, constitute unlawful restraints of trade. *See e.g. United States v. Microsoft Corp.*, 1995–2 Trade Cas. ¶ 71,096, at p. 75,245, 1995 WL 505998 (Microsoft enjoined from using NDAs for purpose of restraining competition).

The Court concludes that Intel had no legitimate business justification for the immediate termination of its NDAs with Intergraph, particularly since there is no evidence that Intergraph ever failed to conform to its obligations under any of the NDAs. The Court concludes that Intel's enforcement of the at-will termination provisions through two retaliatory lawsuits and other threatened actions is unreasonably onerous and intended to restrain competition by Intergraph and others.

### G. Intel's Agreements are Unlawful Restraints of Trade in Violation of Section 1 of the Sherman Act.

Section 1 of the Sherman Act (" § 1") provides that "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In order to prevail on this claim, Intergraph must prove: (1) an agreement to enter a conspiracy; (2) designed to achieve an unlawful objective; and, (3) actual unlawful effects or facts which radiate a potential for future harm to competition. *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 622, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 820 (11th Cir.1990), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990), *appeal after remand*, 980 F.2d 1381 (11th Cir.1993); *U.S. Anchor Mfg.*, 7 F.3d at 1001. The plaintiff is not required to show that Intel's conspiracy under § 1 has a dangerous probability of successfully achieving its objectives. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *U.S. Anchor Mfg.*, 7 F.3d at 1001.

It is not necessary for Intergraph to provide evidence of actual, present competition to show a violation of § 1 so long as it "shows that the potential for competition exists." *Sullivan v. National Football League*, 34 F.3d 1091, 1100 (1st Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1391–92 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). The court is satisfied that Intel is an actual and serious potential competitor of Intergraph in the graphics subsystem market and that Intel controls essential tools that Intergraph needs to compete in that market. It is also obvious to the court that Intergraph will be seriously impaired in that competition without the benefit of a preliminary injunction.

Intergraph "need not prove an intent on the part of the co-conspirators to restrain trade or to build a monopoly . . . [s]o long as the purported conspiracy has an anti-competitive effect, the plaintiff has made out a case under Section 1." *Bolt*, 891 F.2d at 819–20; *U.S. Anchor Mfg., Inc.*, 7 F.3d at 1001. Intergraph has established a § 1 violation and antitrust injury by showing it has suffered "a loss of opportunity to compete" resulting from Intel's discontinuing Intergraph's supply of essential CPUs and technical information while conspiring with Intergraph's competitors to take away Intergraph's customers. *DeLong Equip. Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1198–99 (11th Cir. 1993), *cert. denied*, 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993) (terminated distributor had valid § 1 claim against favored distributors and supplier which cut off plaintiff from supply of vital product needed to compete).

The Court concludes there is a substantial likelihood that Intergraph will succeed in

proving that Intel has entered into one or more agreements and contracts in restraint of trade in violation of § 1.

### H. Necessity of Preliminary Relief to Prevent Threatened Anti–Trust Harm.

Section 16 of the Clayton Act ("§ 16") specifically provides for preliminary injunctive relief for threatened antitrust law violations, stating as follows: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ...." 15 U.S.C. § 26; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (Section 16 "requires a showing only of 'threatened' loss or damage"). The legislative history of § 16 clearly shows a strong Congressional policy supporting preliminary injunction because an antitrust plaintiff "does not have to wait to be ruined in his business before he has his remedy." *Id.* 479 U.S. at 112 n. 8.

Courts have granted preliminary injunctions when there is a serious antitrust issue, serious harm to an antitrust plaintiff and little or no harm to defendant. *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725 (3d Cir.1962); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir.1978); *Foremost Int'l Tours, Inc. v. Qantas Airways, Ltd.*, 379 F.Supp. 88, 97 (D.Haw.1974), *aff'd* 525 F.2d 281 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422–24 (9th Cir.1991) (preliminary injunction upheld prohibiting enforcement of rule banning type of golf club).

Courts often grant mandatory injunctions when necessary to remedy an antitrust violation. *Bergen Drug Co.*, 307 F.2d at 726 (preliminary antitrust injunction granted based on rule of equity that a court may "by mandatory injunction compel a restoration of the status quo" pending final resolution of the case). "District courts are invested with large discretion to model their judgments to fit the exigencies of the particular case." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973)

(stating that mandatory selling on specified terms or compulsory licensing of intellectual property are appropriate antitrust remedies); *Image Technical Serv.*, 125 F.3d at 1196 (upholding a permanent injunction compelling Kodak to sell its spare parts and related equipment to plaintiffs for all existing copiers and all new model copiers Kodak introduced during the 10–year term of the injunction).

### I. Public Interest in the Anti–Trust Laws.

The Court concludes that Intergraph has antitrust standing to assert its antitrust claims against Intel as a former microprocessor competitor (the "Clipper technology") of Intel, as a current competitor of Intel in the graphics subsystem market, as a potential competitor in related markets utilizing CPUs, and as a long-standing customer/competitor of Intel, dependent on Intel as the sole source provider of high performance CPUs and related technical information necessary for Intergraph to compete. The Court is aware, and takes judicial notice, of the current Federal Trade Commission investigation of Intel involving claims of similar conduct toward others by Intel (such as withholding technical information). The Court is also aware of the pending government antitrust case against Microsoft involving claims of monopoly leveraging similar to those made against Intel in this case.

The court is also aware of the important public interest and policies in enforcement of the antitrust laws. Given the clear monopoly power of Intel in the market for high performance CPUs and in the market for its own CPUs, and given the evidence of joint action by Intel with some of Intergraph's competitors to persuade Intergraph's customers to boycott Intergraph, the Court concludes that Intergraph has established a likelihood of success in proving antitrust violations of Sections 1 and 2 of the Sherman Act.

In light of the strong purposes behind the antitrust laws, to prevent threatened harm to competition and to protect potential and actual competition, the court concludes that a preliminary injunction is necessary and appropriate to restore the status quo so that

Intergraph will not be driven out of business or severely impaired pending trial.

## J. Specific Performance of Intel's Commitments.

During the course of their business relationship, Intergraph facilitated Intel's entry into the workstation market, respected the confidentiality of Intel's information and participated in all major programs upon which reasonable conditions were imposed by Intel. Until this dispute over the use of Intergraph's intellectual property rights arose, Intel never canceled an NDA or RUNDA with Intergraph. Even when friction between the companies emerged in early 1997 over unrelated patent issues, Intel made a number of commitments to Intergraph in its March 28, 1997, letter to Intergraph. In this letter, Mr. Johnson's specific references to the Deschutes and Merced programs, as well as "future programs" for which there was a known time frame, convince the court that this is a promise of determinable duration, one that is not terminable at will.

In *UFE Inc. v. Methode Electronics, Inc.*, 808 F.Supp. 1407 (D.Minn.1992), the Court affirmed the finding by a jury that an agreement, which was silent as to its duration, was for a five year minimum term. The parties' discussion of a five year term, and references to that same time period in both parties' internal documents, were cited in support of this conclusion. *See also Panhandle Agri-Service, Inc. v. Becker*, 231 Kan. 291, 644 P.2d 413 (1982) (reference to specific quantity of material to be supplied gave the contract a duration: the time necessary for that quantity in fact to be supplied). Here, the writing between Intel and Intergraph, in the form of a letter from Mr. Johnson, contains sufficient evidence of a determinable duration to their agreement.

The letter also contemplates a reciprocal obligation or consideration on the part of Intergraph: its "continued support" (as well as payment for Intel Products). Accordingly, this court finds that there is a substantial likelihood that Intergraph will establish on the merits that the letter and surrounding circumstances constitutes an enforceable agreement of definite duration.[45] For purposes of this Opinion, then, the March 28, 1997 letter is hereinafter referred to as "the Letter Agreement."

Intel contends that the Letter Agreement, or any agreement between the parties, "incorporates by reference" all terms in the NDAs and RUNDAs. One of those provisions is the unilateral right to terminate an NDA or a RUNDA at will (i.e., the "Termination Clause"). But, if the Termination Clause is incorporated by reference, then the promises in the Letter Agreement, which Intel contends are "aspirational," are actually illusory. It is axiomatic that courts will not interpret agreements so that they become meaningless. An incorporation by reference theory that renders a contract meaningless simply cannot overcome Intel's specific commitments to Intergraph.

An NDA typically is very limited in duration and scope; this fact further undercuts Intel's claim that its terms are incorporated into broad commitments such as those set forth in the Letter Agreement.

The court, accordingly, finds there is a substantial likelihood that Intergraph will establish on the merits that the Letter Agreement and surrounding circumstances form the basis for an agreement between the parties without the right on the part of either party to unilaterally and arbitrarily terminate the agreement. Moreover, the court finds there is a substantial likelihood that Intergraph will be able to establish on the

---

**45.** Notwithstanding the presence of open terms, the promises in the Letter Agreement are sufficiently definite to be enforceable. *Thermal Sys. Of Ala. v. Sigafoose*, 533 So.2d 567, 571 (Ala. 1988); *H.C. Schmieding Prod. Co. v. Cagle*, 529 So.2d 243, 248 (Ala.1988). In cases such as this, the UCC's "gap-filler" provisions supply the open terms. *See Ala.Code* §§ 7–2–305 to 310.

Intel has submitted a single NDA containing a California choice of law provision. However,

the Letter Agreement originated in Huntsville, Alabama. Accordingly, Alabama law applies to the interpretation of this Agreement. In any event, California has adopted verbatim the same provisions of the Alabama Uniform Commercial Code discussed herein. Moreover, California commercial law is more favorable to Intergraph, as, unlike Alabama, it allows the UCC's obligation of "good faith and fair dealing" (Section 1–203) to stand alone as a cause of action.

merits that the agreement was of a sufficiently definite duration: at a minimum through the time period in which Intel develops the Deschutes and Merced programs, and perhaps longer.

Because this is a commercial case involving the sale of "goods," the Uniform Commercial Code ("UCC") authorizes the court to specifically enforce an agreement where the "goods are unique or in other proper circumstances." *Ala.Code* § 7–2–716(1). "Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation . . . ." *Id.* at Official Comment, Note 2.

The Court finds several cases to be of particular importance. The first such case is *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F.Supp. 923, 925 (N.D.Cal.1970), *appeal dismissed*, 443 F.2d 1364 (9th Cir.1971), involving an aluminum manufacturer that sought a preliminary injunction to enforce a supply agreement. The agreement in *Kaiser Trading* was for the supply of cryolite, a unique, scarce and indispensable chemical compound used in the production of aluminum. *Id.* at 925. The only natural source of cryolite had been effectively exhausted, requiring aluminum manufacturers to rely on a synthetically produced substitute. There was no question but that synthetic cryolite was available on the open market; however, the court found it was not available in the quantity, or in the time-frame needed, by the manufacturer. *Id.* at 933. Accordingly, the court granted the preliminary injunction, requiring the supplier to specifically perform its obligations. *Id.* at 932, 937.

Equally persuasive is *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir.1996), even though that decision avoided strict UCC analysis. In *Ross–Simons*, the First Circuit affirmed the trial court's mandatory injunction requiring a manufacturer of crystal to specifically perform its obligation to supply its product to a jewelry and gift retailer. Even though the crystal constituted less than one percent (1 percent) of the retailer's sales, the court relied upon its "uniqueness." *Id.* at 19. It observed, in this regard, that "several courts have recognized that the loss of a prestigious brand of product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap." *Id.* at 10 (citations omitted). *See also Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429, 433 (S.D.Fla.1975) (under certain "circumstances, a decree of specific performance becomes the ordinary and natural relief rather than the extraordinary one.").

Intel Products are "unique." The evidence establishes there is no alternative source for these items. If specific performance can apply to an agreement to supply a particular type of crystal to a jewelry and gift retailer, as it did in *Ross–Simon*, it certainly can apply to the supply of products for which there exists no present replacement. This is particularly so given the "Intel Inside" marketing program and the prestige associated with Intel Products. Furthermore, as demonstrated in *Kaiser Trading*, specific performance is also appropriate where an alternative distribution system for the unique product cannot assure it will be received in the time, or in the quantities, necessary to maintain the status quo.

Accordingly, the court finds that there is a substantial likelihood that Intergraph will be able to establish on the merits that it is entitled to specific performance of the Letter Agreement, including Intel's support of Intergraph as a "strategic customer" at least through 1999, when the Merced program is publicly launched, and perhaps through the year 2000.

## K. Relief from the Unconscionable Nature of NDAs.

Intel contends the Termination Clause applies—because, either the March 28, 1997, letter is not an enforceable agreement, leaving the NDAs or RUNDAs to control, or because the termination clauses of the NDAs and RUNDAs are incorporated by reference into the letter agreement. Even if Intel is correct, the court concludes, in the alternative, that the deliberate termination of the parties' relationship by Intel, under the

terms of the NDAs and RUNDAs, is unconscionable for two independent reasons. First, the circumstances in existence at the time the NDAs and RUNDAs were executed between the parties reveal that the respective Termination Clauses are unconscionable at the outset. Second, the evidence demonstrates that operation of the respective Termination Clauses in the way now advocated by Intel would create an unconscionable situation with regard to Intergraph.

### 1. The NDA's Were Unconscionable At The Time They Were Made.

Applicable provisions of both the Alabama and California versions of the UCC provide:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

*Ala.Code* § 7–2–302 (1975); *Cal. Civil Code* § 1670.5. While unconscionability is not defined by the code or the comments, the commentary to Section 7–2–302 describes the basic test as "whether, in light of the general commercial background and the *commercial needs of the particular trade or the case,* the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *Ala.Code* § 7–2–302 (Official Comment 1) (emphasis added).

The determination of unconscionability is a question of law, to be determined by the court with each case decided on its own facts. *E & W Bldg. Material v. American Sav. & Loan Ass'n of Brazoria County, Tex.,* 648 F.Supp. 289, 290 (M.D.Ala.1986). Alabama courts have identified four factors to be considered in determining whether a contract is unconscionable: (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms unreasonably favor one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract. *See e.g. Lloyd·v. Service Corp. of Ala., Inc.,* 453 So.2d 735, 739 (Ala.1984). While unconscionability cases most often arise in the consumer context, the principle applies with equal force in the commercial field.

In *Allen v. Michigan Bell Telephone Co.,* 18 Mich.App. 632, 171 N.W.2d 689 (1969), the plaintiff sued Michigan Bell for its failure to include plaintiff's advertisements in the "yellow pages" directory. Michigan Bell raised as an affirmative defense a contract term relieving it from liability for the failure to include items of advertising in its directory. *Id.* 171 N.W.2d at 690. Finding this term unconscionable, the court explained:

Implicit in the freedom of contract is the concept that at the time of the contracting each party has a realistic alternative to acceptance of the terms offered. *Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without.* Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was "freely" entered into, when it was not.

*Id.* 171 N.W.2d at 692 (emphasis added).

The Alabama Supreme Court, in *Morgan v. South Central Bell Telephone Co.,* 466 So.2d 107 (Ala.1985), also found invalid an exculpatory clause that sought to limit a telephone company's liability when it failed to publish a professional association's advertisement. While the *Morgan* court focused on the company's status as a regulated utility (though its "yellow pages" business was not regulated), it nevertheless focused on the fundamental commercial purpose behind the

unconscionability doctrine, stating, "We are satisfied that the plaintiffs did not have a meaningful choice ... and that the defendants had the bargaining power in a gross and unbalanced manner in determining the terms and conditions [of the contract]." *Id.* at 118.

What the evidence demonstrates in the instant case, regarding the circumstances under which Intel and Intergraph entered into NDAs and RUNDAs, is that: (1) after Intergraph shifted its design and production efforts away from the Clipper/UNIX based systems it had been producing and entered into a relationship with Intel, the defendant began to condition the delivery of Intel Products and information to Intergraph upon the execution of NDAs and RUNDAs, which contained a unilateral and unconditional termination provision; (2) as Intel and Intergraph enjoyed a mutually beneficial and productive relationship, there was no special commercial need in the computer industry for automatic termination of ongoing agreements; (3) while the termination provision was available to both parties, Intergraph had no suitable alternatives and, in a practical sense, had no real option to exercise its right to terminate; (4) Intel was the sole source of Information and Chips necessary for Intergraph to stay in business; (5) Intel had a greatly disproportionate bargaining power that enabled it to impose terms and conditions in the NDAs and RUNDAs that benefitted it, to the detriment of Intergraph; and (6) Intel, using its disproportionate bargaining power, imposed terms and conditions unfavorable to Intergraph in the NDAs and RUNDAs, making them non-negotiable.

Accordingly, the court finds it likely that Intergraph will be able to establish on the merits of its claims that the Termination Clause in each respective NDA and RUNDA was unconscionable at the time it was made and would not be enforceable even if it applied.

## 2. Termination of the NDAs Would Be Unconscionable.

Furthermore, the court finds that, even if the Termination Clauses are applicable and were not unconscionable at the time they were made, it would be unconscionable to permit Intel to enforce them against Intergraph today. The UCC deals with the subject of unconscionability in a context similar to the present circumstances, namely when one party to a commercial agreement seeks to exercise its claimed rights under an automatic termination clause, and where no advance notice to the other party is required under the clause. Section 2–309(3), which focuses on contract termination, provides: "... an agreement dispensing with notification [of termination] is invalid if its *operation* would be unconscionable". *Ala.Code* § 7–2–309(3); *Cal. Comm.Code* § 2309 (emphasis added). The commentary to this provision directs attention to the "results" of exercising such power: "An agreement dispensing with notification or limiting the time for the seeking of a substitute arrangement is, of course, valid under this subsection unless the results of putting it into operation would be the creation of an *unconscionable state of affairs.*" *Id.* (Official Comment, Note 8) (emphasis added).

In *Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598, 602 (1973), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974), the court voided a clause giving an oil company the right to terminate a dealership agreement on 10 days' notice, even though the dealer knew and understood the terms of his lease at the time it was signed. Notwithstanding the dealer's sophistication, the court found the termination clause grossly unfair because, if the oil company terminated the contract, it could always get another dealer. The dealer, in contrast, had everything to lose, since, even if he could move to another location, the going business and trade he built would remain with the old location.

It is apparent that the drafters of Section 2–309(3) of the UCC focused upon the circumstances created by the threatened or actual use of the termination clause and not upon the circumstances under which the agreement was made. "The conclusion seems inescapable that the Code intends the focus of an unconscionability determination under 2–309 be on the result of its application as seen at the time of termination." White & Summers, Uniform Commercial

Code, 4th Ed., Vol. 1, p. 139–140; *see also* Hillman, McDonnel & Nickles, Common Law & Equity Under the UCC, p. 3–42 (1985) ("the court must focus on its effect at the time of contract breakdown"). It follows that the focus in this case must be on the circumstances present at the time of "contract breakdown," which was in or about August of 1997. That was when Intel first terminated the NDAs and RUNDAs, and when Intel denied Intergraph critical information or equipment necessary to debug Chips previously supplied by Intel. Significantly, at no time has Intergraph been in breach of any NDA or RUNDA, which makes the abrupt termination even less justified.

With respect to the "results" that Intel's exercise of the Termination Clause would have on the "state of affairs" between the parties, the Court finds: (1) Intel presently maintains 100 percent of the market for microprocessors and related products in the high speed workstation market in which Intergraph specializes; (2) Intergraph has taken reasonable steps to investigate alternatives to Intel Products; (3) presently, Intergraph has no viable alternative to Intel Products; (4) Intel concedes there will be no alternative in the immediate future; and (5) if it does not receive Intel Products on a timely basis and in sufficient quantities, then Intergraph very quickly will fall behind its competitors, and Intel, rather than the marketplace, will determine whether or not Intergraph will stay in business.

Furthermore, the court also concludes that there is a substantial likelihood that Intergraph will establish on the merits that Intel's present attempt to invoke the Termination Clause, or otherwise delay Intergraph's involvement with future Intel Products, will create an unconscionable state of affairs. The Termination Clause therefore is unenforceable even if it applies.

**3. Intergraph is Entitled to "Reasonable Notification" of Termination.**

Under the Court's earlier finding, the Letter Agreement is specifically enforceable. If it is not, or if it is a contract of indefinite duration, then an unconscionable result must yet be avoided. Section 2–309(2) of the UCC imposes an obligation to give "reasonable notification" of termination. This commercially imposed standard embraces both policy and economic rationales. While it is a fluid standard—what is reasonable turns upon the particular circumstances of the situation—its purpose is unwavering: a supplier may not abandon its purchaser until that purchaser has made suitable, alternative arrangements, which are least disruptive to its business.

The commentary to Section 2–309 amplifies the policy and economic rationales behind the "reasonable notification" requirement:

> Subsection (3) recognizes that the application of *principles of good faith and sound commercial practice normally call for such notification* of the termination of a going contract relationship *as will give the other party reasonable time to seek a substitute arrangement.*

*Ala.Code* § 7–2–309; *Cal. Comm.Code* § 2309 (Official Comment 8) (emphasis added).

The question of "reasonable notification" is typically one for the trier of fact. However, little or no notice is unreasonable as a matter of law. In *Jo-Ann, Inc. v. Alfin Fragrances, Inc.,* 731 F.Supp. 149, 160 (D.N.J.1989), the court determined that no notice was unreasonable as a matter of law. Instead, the court in *Jo-Ann* observed, with respect to distribution agreements, that the notice must allow the buyer reasonable time to find other arrangements. *Id.* at 160. In *Pharo Distributing Co. v. Stahl,* 782 S.W.2d 635, 11 U.C.C. Rep. Serv.2d 814, 817 (Ky. App.1989), the court held that six days notice left no "inference" other than that is was unreasonable. There, the court commented that reasonable notice is that time period that, under the circumstances of the particular case, would allow a party to make alternate arrangements upon termination of the contract and would allow a party to minimize losses. *Id.* at 816.

One court has held that one-year advance notice of termination was not, as a matter of law, sufficient. *Hamilton Tailoring Co. v.*

*Delta Air Lines, Inc.,* 14 U.C.C. Rep. Serv. 1310, 1316, 1974 WL 21756 (S.D.Ohio 1974). Even cases finding a certain amount of advance notice to be "reasonable" illustrate the policy and economic factors at work. In *Monarch Beverage Co. v. Tyfield Importers, Inc.,* 823 F.2d 1187, 1190–91 (7th Cir.1987), a wholesaler of wine products sued its supplier, the exclusive importer of a brand of sparkling wine, on an oral distribution agreement. The Seventh Circuit ruled that a district court's determination, finding that thirty days' notice of termination was reasonable, was not clearly erroneous after considering the nature, purpose, and circumstances of the action. *Id.* at 1189. In affirming the district court's conclusion, the Seventh Circuit was influenced by the following factors:

 1. Advance notice of 30 days provided the wholesaler with sufficient time to find a substitute product.

 2. The wholesaler also distributed a competitor's brand of sparkling wine, so the wholesaler could easily use that brand as a substitute.

 3. The sales of the product at issue constituted only one percent or less of the wholesaler's total sales.

*Id.* at 1190. *See also Teitelbaum v. Hallmark Cards, Inc.,* 25 Mass.App.Ct. 555, 520 N.E.2d 1333 (1988) ("the adequacy of the notice is generally coextensive with the amount of harm that can be proved by the party who has incurred the loss of a supplier."); *Aaron E. Levine & Co. v. Calkraft Paper Co.,* 429 F.Supp. 1039 (E.D.Mich.1976) (ten months' advance notice was reasonable; supplier gave dealer the names of competing suppliers and dealer did, in fact, find a substitute).

In this instance, Intel has sought to abuse its dominant market position in the workstation microprocessor industry by terminating, without notice, its supply relationship with Intergraph. Such conduct is not permitted by the Uniform Commercial Code and the circumstances of this case.

Accordingly, the Court alternatively concludes that a substantial likelihood exists that Intergraph will establish on the merits that Intel failed to give "reasonable notification" of its intent to terminate the parties' agreements. The Court further finds that, under these circumstances, reasonable notification would take effect at the conclusion of the Deschutes and Merced Programs continuing through 1999.

## VI. The Propriety of Injunctive Relief Against Intel.

### A. The Court's Inherent Power to Order Injunctive Relief.

 The court is possessed with inherent and broad equitable powers to fashion an appropriate remedy to deal with the particular wrong in each case. *See Williams v. City of Dothan, Ala.,* 818 F.2d 755, 760 (11th Cir.1987), *opinion modified and reh'g denied,* 828 F.2d 13 (1987) (finding mandatory injunction issued by district court valid in later proceeding to enforce injunction). Accordingly, the power resides in this court to "do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) (equity jurisdiction distinguished by flexibility rather than rigidity); *see also FTC v. U.S. Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984) (affirming trial court's power to issue a preliminary injunction and order a freeze of assets during pendency of action for permanent injunctive relief).

 The Court also has the power to grant preliminary injunctive relief where a party's conduct is calculated to frustrate litigation. *Bergen Drug Co. v. Parke, Davis & Co.,* 307 F.2d 725 (3d Cir.1962) ("True enough, the defendant can choose customers, but it should not be permitted to do so in order to stifle the main action, especially where it is apparent that such conduct will further the monopoly which plaintiff alleges defendant is attempting to bring about and which, if proved, would entitle plaintiff to permanent relief.").

 In the present case, Intel has engaged in a number of acts that justify the exercise of this Court's inherent equitable power. For example, on March 28, 1997, Intel delivered to Intergraph a letter containing a significant number of commitments.

While the Court believes this communication rises to the level of a contract, it at least evidences conduct that easily could support Intergraph's claim of fraud. At a time when patent disputes between the parties already had surfaced, Intel wrote in friendly terms about the parties' relationship and declared its "intent of supporting Intergraph as a strategic customer in current and *future* programs." Intel did not in any way link these promises to a resolution of the separate dispute involving Intergraph's patent rights, much less the surrender of those rights. At the very least, Intel's assurances, contained in the letter of March 28, 1997, could have lulled Intergraph into believing that its relationship with Intel was secure and that there was then no need to investigate and seek out alternatives to Intel's products.

The preliminary injunction to be fashioned by the court is designed solely to preserve the status quo, to prevent the irreparable harm that threatens Intergraph and to achieve the appropriate equitable balance of "what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

## B. Standard for Granting Injunctive Relief.

Intergraph has adequately established a need for mandatory injunctive relief at this stage of the proceedings. The court is of the opinion that Intergraph has established (1) a substantial likelihood of success on the merits of one or more of its claims, (2) the imminent threat of irreparable injury in the absence of injunctive relief, (3) that the threatened harm to Intergraph outweighs any potential harm to Intel that would be caused by an injunction, and (4) that the grant of an injunction will not disserve the public interest. *Johnson v. U.S. Dept. of Agriculture*, 734 F.2d 774, 781 (11th Cir. 1984).

In making these determinations, the court specifically finds that the issuance of preliminary injunctive relief is necessary "to pre-

serve [this court's] ability to render a meaningful decision on the merits." *United States v. State of Ala.,* 791 F.2d 1450, 1459 (11th Cir.1986), *reh'g denied,* 796 F.2d 1478 (1986), *cert. denied sub. nom., Board of Trustees of Ala. State Univ. v. Alabama State Bd. of Educ.,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). For instance, the court believes that the potential for the loss of thousands of jobs at Intergraph by the time this case is ready for trial would be an untenable result that could not be remedied by an award of money damages to Intergraph.

## C. Substantial Likelihood of Success on the Merits.

Intergraph has established a substantial likelihood of success on the merits on one or more of its claims. *Johnson,* 734 F.2d at 789 ("it is sufficient to note that plaintiffs will likely prevail at least in part"). While Intel has raised questions about Intergraph's ability to ultimately prove several elements of its causes of action, the court's role at this juncture is not to make final determinations on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981); *Johnson,* 734 F.2d at 781–82 (findings at preliminary injunction hearing have "no conclusive bearing at the trial on the merits"); *Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir.1975) (plaintiff's allegations of misrepresentations, not conclusively controverted in the record on preliminary injunction, are sufficient to sustain temporary injunction). Instead, the Court must determine whether the evidence presented demonstrates a substantial likelihood that Intergraph will prevail on one or more of its claims on the merits.

Intergraph has sufficiently demonstrated that it is substantially likely to establish on the merits one or more of its claims that support the grant of injunctive relief. While not necessary to the Court's conclusions, this is particularly so in light of the severity of the injury that Intergraph faces in the absence of injunctive relief.[46] *Cf. Canal Au-*

46. It is important to note that on a preliminary injunction determination, the quality of evidence is not restricted to what would be admissible at

trial. At this stage, Intel has had an opportunity to rebut, but has failed to rebut, the key evidentiary assertions made by Intergraph, and there-

*thority of State of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974) (severity of hardship may lessen the showing needed on the merits); *Gartrell v. Knight,* 546 F.Supp. 449, 455 (N.D.Ala.1982); *Clark Const. Co. v. Pena,* 895 F.Supp. 1483, 1489 (M.D.Ala.1995).

### D. Threat Of Irreparable Harm.

Intergraph has carried its burden of showing the threat of irreparable harm. While Intel would ask the court to await a more complete record that establishes actual harm to Intergraph, this request ignores the fact that injunctive relief is only meaningful if used to counter the threat of such harm. To wait for actual irreparable harm to occur would render this relief futile, or at the very least, incomplete. Moreover, particularly in the context of the heavy media scrutiny attendant in this case, Intergraph has established that Intel's refusal to deal likely will have an immediate impact on Intergraph's good will and reputation with its customers. Loss of good will and harmed reputation are types of injuries that are sufficient to establish the need for injunctive relief. *Ross–Simons,* 102 F.3d at 19–20 ("By its very nature, injury to good will and reputation is not easily measured or fully compensable in damages"); *see also American Hosp. Supply v. Hospital Prods., Ltd.,* 780 F.2d 589, 595 (7th Cir.1986) (finding that good will is a common factor showing irreparable harm); *Computer Assocs. Int'l, Inc. v. State Street Bank and Trust Co.,* 789 F.Supp. 470, 471–72 (D.Mass.1992) (finding of irreparable harm to Bank's business and reputation because lack of maintenance support threatened "functionality" of computer program, or alternatively, raised questions about the program's continued "availability" to the Bank and its customers).

The Court is convinced that Intel's current course of action in cutting off the supply of Chips, Information and Support to Intergraph, if not certain to force Intergraph out of business, would almost certainly create losses impossible to calculate in terms of monetary value. *Ferrero v. Associated Ma-*

*terials Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991).

In *Ross–Simons,* the First Circuit Court of Appeals affirmed the grant of an injunction to maintain the status quo, i.e., to require Baccarat, Inc., a supplier of fine crystal, to continue to supply Ross–Simons, a distributor, with crystal in the manner which it had previously agreed upon before the interruption. 102 F.3d 12. With only the substantial likelihood of prevailing and the irreparable harm factors at issue, the appellate court found that the plaintiff had carried its burden of showing the elements entitling it to an injunction. In particular, the court found that, because of the "unique top-shelf" nature of the product at issue, plaintiff's "inability to supply products as advertised would wreak substantial (but immeasurable) damage to the good will that [the plaintiff] painstakingly had created over the years." *Id.* at 19. Further, "the lost sales … alienation of future [bridal] registrants, and harm to its reputation, would defy accurate quantification." *Id.*

Intergraph has adequately demonstrated to the court that, at the very least, it will suffer a loss of good will and harm to its reputation—in other words, irreparable harm—in the absence of injunctive relief.

### E. Balancing the Harms.

The court is persuaded that the harm to Intergraph, in the absence of injunctive relief, would outweigh any harm that Intel will potentially suffer if the court grants the relief. Intel's counsel has argued that Intel would be harmed by a mandatory injunction because it would not be allowed to fully control its intellectual property, but that is the sort of harm to any party that is subject to injunctive relief. The question is whether that loss of control causes it any harm and, if so, whether that harm outweighs the threatened harm to the movant.

Intel has failed to show that providing its intellectual property and products to Intergraph causes it any significant harm. The lack of control of this intellectual property

---

fore, the court finds the quality of evidence submitted by Intergraph to be sufficient to support the findings herein.

would only be as to Intergraph. There is no record of Intergraph providing Intel's confidential information to others or otherwise using such information in a way that harms Intel. Further, the relief proposed by Intergraph includes its obligation to maintain the confidentiality of information disclosed pursuant to the NDAs, the RUNDAs or the injunction. The court finds that, at most, Intel's partial loss of control of its intellectual property will cause a *de minimus* harm, which in no way outweighs the substantial threatened harm shown by Intergraph. As noted earlier, Intel will be required to do now only what it did willingly until the parties were unable to resolve a completely unrelated matter, the use of Intergraph's patent rights.

### F. The Public Interest.

Finally, the court finds that granting the mandatory injunction will not disserve the public interest. On the contract, injunctive relief at this stage of this proceeding is more likely to serve the public interest than to disserve that interest. Intel currently is the subject of a Federal Trade Commission investigation that appears to target similar alleged conduct by Intel in using its control of the microprocessor market in a coercive manner. The only effect on the market that this court can foresee, as a result of its mandatory injunction, would be to enhance competition, not to harm competition. In addition, granting the injunction is likely to preserve the jobs of Intergraph employees that otherwise are at risk because of the demonstrated threat to the continued viability of Intergraph during the pendency of this action.

In conclusion, the court's burden in weighing the standards for injunctive relief is not to make binding determinations of fact about the ultimate merits of this case. Instead, the court is to judge the likelihood of success, along with the threatened harm to Intergraph, as balanced against any harm to Intel that an injunction would cause. In doing so, the court should not take action which would disserve the public interest. In light of these factors, the court finds that it is appropriate for an injunction to issue in order to protect its ability to render a meaningful decision on the merits of this action.

### G. Administrative Burdens Associated with Administering Injunctive Relief.

Intel suggests that injunctive relief of the sort requested by Intergraph will impose undue administrative burdens on the court. The court is satisfied that burdens will fall to it regardless of whether the requested relief is granted or denied. The parties have made it clear that the court should anticipate a hard-fought, paper-intensive litigation process. Since Intergraph refused to relinquish its patent rights to Intel:

a. Intel mailed a letter to Intergraph on August 13, 1997, which terminated all NDAs, demanded the immediate return of confidential information, and cut off the supply of Chips after December 31, 1997. It thereafter withdrew this termination.

b. Within hours of the time this lawsuit was filed on November 17, 1997, Intel again canceled all NDAs, demanded the immediate return of confidential information, and cut off the supply of Chips after December 31, 1997, even though it already had committed to supply Chips through March 31, 1998. After this conduct was called to the attention of this Court, Intel agreed to supply chips through March 31, 1998.

c. One day after suit was filed, Intel imposed a three day deadline for Intergraph to submit a request for the allocation of Chips for the Second Quarter of 1998. There is no evidence the letter was received by Intergraph until December 1, 1997. In any event, the deadline of November 21, 1997, was several weeks earlier than that previously imposed by Intel. Intel thereafter agreed to permit Intergraph to submit an allocation on December 9, 1997.

d. Within a week of suit being filed, Intel informed Intergraph that it was reneging on its earlier promise to supply 25 sets of Advance Chip Samples for the Deschutes program by the middle of December 1997.

e. Within 10 days of Intergraph's suit, Intel filed two separate lawsuits in the

federal courts in California that clearly have a substantial overlap with the claims made in the instant case.

f. Intel withheld information it was obligated to provide Intergraph. It thereafter supplied some of the needed information.

g. Intel refused to provide a supply of its Deschutes chip to Intergraph until those chips were publicly released, and then it refused to provide the technical data necessary for the plaintiff to make proper use of those chips.

Whether, as counsel to Intel suggests, Intergraph seeks "most favored nation" status, Intel should be assured that the court has no intention of granting it any special status. The terms of the injunctive relief will not require Intel to designate Intergraph a "Validation Partner" or to afford it other unusually favorable treatment. Rather, the relief is directed to the "nuts and bolts" of Intergraph's business, and it simply requires that Intel supply Intel products to Intergraph at the same time, and in proportionate quantities, that such items are supplied to Intergraph's competitors. If, however, Intel insists that the practical effect of the relief is to grant Intergraph rights beyond the status quo that existed prior to the contract breakdown, then the court is willing to examine the terms of Intel's deals with Intergraph's competitors and craft an appropriate remedy consistent with the intent of this Order.

To reiterate, it is the intent of the court that Intel treat Intergraph similarly to the way it treats its customers who are similarly situated to Intergraph, no better and no worse. Men and women of good will should have no difficulty doing as the court will direct. Should any party not be able or willing to follow the court's instructions, they should be advised now that the court can and will take appropriate steps to enforce its order. That conceivably could include the appointment of a special master, whose duty it would be to examine the parties' compliance with the court's order and to report the facts and make a recommendation to the court. Counsel and the parties should also clearly understand that the court has little patience with lawyer "word games," but tends instead to cut through to the heart of a matter.

## VII. Preliminary Injunction.

Accordingly, pending further order of the court, it is hereby **Ordered, Adjudged, and Decreed:**

Intel Corporation, its officers, agents, servants, employees, and attorneys, and anyone acting in concert with any of them, shall be and they hereby are **PRELIMINARY ENJOINED** from terminating Intergraph's rights as a "strategic customer in current and future programs," or from otherwise taking any action adversely affecting Intel's business relationship with Intergraph or Intergraph's ability to design, develop, produce, manufacture market or sell products incorporating, or based upon, Intel products or information, including but not limited to the following:

a. Intel shall supply Intergraph with all Intel product information, including but not limited to technical, design, development, defect, specification, support, supply, future product, product release or sample data, whether existing in product data books, "yellow backs," Confidential Information Transmittal Records, email or other mediums (hereinafter "Information"), in such form and content as supplied to and at the same time Intel supplies such Information to Intergraph's similarly situated competitors, such as Hewlett Packard, Compaq, Dell, IBM, NetPower and Silicon Graphics (hereinafter "the Competitors"), whether it is on an advance basis for the development of motherboards, graphics subsystems or workstations utilizing Intel's existing, or future generation products (hereinafter "Product Development"), on current products as needed for support of such products. Intel shall be required to maintain a log of the disclosure of Information to Intergraph and its similarly situated Competitors, and upon request of the court, certify to this court its compliance with the procedures and timely delivery of such Information.

b. Intel shall supply to Intergraph all Information of the type or content made available by Intel to Intergraph through third parties (hereinafter "Third Party Infor-

mation"), at the same time it permits, or provides, the disclosure of such Third Party Information to Intergraph's similarly situated Competitors, whether it is on an advance basis for Product Development or on a current basis for the support of products in distribution. Intel shall be required to maintain a log of the disclosure of Third Party Information to Intergraph and its Competitors, and upon request of the court, certify to this court its compliance with the procedures and timely delivery of such Information.

c. Intel shall supply Intergraph with an allocation, and set aside a supply of microprocessors, semiconductors, chips, and buses (hereinafter "Chips") on an advance basis for product development ("Chips Samples"), in such quantities as forecasted by Intergraph in the same manner and the same terms as is done by Intergraph's similarly situated Competitors, or in proportional quantities as supplied to Intergraph's similarly situated Competitors, and at the same time Intel supplies such Chips Samples to Intergraph's similarly situated Competitors, at the prevailing rate charged to Intergraph's similarly situated Competitors. Intel shall be required to maintain a log of the release, or delivery, of Chips Samples to Intergraph and its Competitors, and upon request of the court, certify to this court its compliance with the procedures and delivery of such Chips Samples.

d. Within eleven (11) days of the date on which Intergraph posts the bond, as required by subsection (h) of this order, Intel shall supply Intergraph with 25 sets of Deschutes Chips Samples, together with all technical data needed to permit Intergraph to develop, design, and manufacture its products. Such technical data shall be of the same type, nature, and extent of technical data provided to Intergraph's similarly situated Competitors.

e. Intel shall supply Intergraph with an allocation, and set aside a supply, of Chips which have been manufactured by or on behalf of Intel for distribution (hereinafter "Production Chips"), as well as all future chips proposed by, or available from Intel, including but not limited to 333mhz Pentium II, BX, Deschutes and Merced Chips, in accordance with a forecast supplied by Inter-

graph. Intergraph shall provide Intel with a forecast for Production Chips at least one (1) quarter in advance of the quarter in which Intergraph desires to receive delivery of such Production Chips.

(i) Intel shall supply its authorized distributors with sufficient quantities of Production Chips to fulfill Intergraph's allocation of Production Chips, when such allocation has been presented by Intergraph to Intel's authorized distributor for fulfillment. Intergraph shall, as it has agreed to do, purchase Production Chips available through Intel's authorized distributors by placing an order for such an authorized distributor to fulfill Intergraph's Production Chips allocation. Intergraph shall negotiate the terms and conditions for the supply of its Production Chips allocation with any Intel authorized distributor of its choosing, and Intel shall not take any action, or fail to take any action, that will interfere with or effect Intergraph's terms, conditions, negotiations or relationship with the Intel authorized distributor selected by Intergraph, including but not limited to actions pertaining to prices, discounts, volumes, shipping or delivery pertaining to such Production Chips. Intel shall be required, upon request of the court, to certify to this court its compliance with the procedures with the applicable authorized distributor and delivery of such Production Chips.

(ii) Intel shall supply Intergraph with Production Chips not yet available from Intel's authorized distributors ("Early Production Chips") in such quantities as forecasted by Intergraph, or in proportional quantities as supplied to Intergraph's similarly situated Competitors, at the same time Intel supplies such Early Production Chips to Intergraph's similarly situated Competitors, at the prevailing rate charged to Intergraph's similarly situated Competitors. Intel shall be required to maintain a log of the simultaneous release, or delivery, of Early Production Chips to Intergraph and its similarly situated Competitors, and upon request of the court certify to this court its compliance with the procedures. and delivery of such Early Production Chips. Notwithstanding the foregoing, Intel shall supply Intergraph those Early Production Chips ordered by Intergraph

for the 1st Quarter of 1998 at the prices previously agreed to by the parties.

f. Intel shall include Intergraph as an "active member of the Intel Inside program," and provide it all rights, privileges and opportunities made available to all other members.

g. Intel shall provide Intergraph "marketing involvement" and include it in "new product introduction events" of the type in which Intel includes Intergraph's similarly situated Competitors.

h. Within eleven (11) days of the date on which this order is entered, Intergraph shall post a bond with the clerk of the court, subject to approval by the clerk of the court, as required by Fed.R.Civ.P. 65(c), in the amount of $25,000.00, as security against and as payment for such costs and damages as may be incurred or suffered by Intel in the event that Intel is found to have been wrongly enjoined by this order.

i. Intergraph shall maintain the confidentiality of all Information, Third Party Information, Chip Samples and Early Production Chips, in accordance with the terms, conditions and procedures of the applicable non-disclosure agreements as previously agreed to by the parties. The Confidentiality provisions of any applicable non-disclosure agreements previously entered into by and between Intel and Intergraph are expressly incorporated herein.